UNITED STATES *v.* SHARPNACK.

No. 35.   Argued October 29, 1957.—Decided January 13, 1958.

*Beatrice Rosenberg* argued the cause for the United States.   With her on the brief were *Solicitor General Rankin, Warren Olney, III,* then Assistant Attorney General, and *Leonard B. Sand.*

*Joel W. Westbrook* argued the cause and filed a brief for appellee.

MR. JUSTICE BURTON delivered the opinion of the Court.

The issue in this case is whether the Assimilative Crimes Act of 1948, 18 U. S. C. § 13, is constitutional insofar as it makes applicable to a federal enclave a subsequently enacted criminal law of the State in which the enclave is situated.   For the reasons hereafter stated, we hold that it is constitutional.

A four-count indictment, in the United States District Court for the Western District of Texas, charged the appellee, Sharpnack, with committing sex crimes involving two boys in violation of 18 U. S. C. § 13, and Arts. 535b and 535c of Vernon's Texas Penal Code, 1952.   The offenses were charged to have been committed in 1955 at the Randolph Air Force Base, a federal enclave in Texas.

Articles 535b and 535c had been enacted in 1950 and, at the time of the commission of the alleged offenses, were in force throughout the State. Also, since 1948, the Federal Assimilative Crimes Act has provided that, within such an enclave, acts not punishable by any enactment of Congress are punishable by the then effective laws of the State in which the enclave is situated.[1] Nevertheless, upon motion of Sharpnack, the District Court, in an unreported order, dismissed the indictment "for the reason that Congress may not legislatively assimilate and adopt criminal statutes of a state which are enacted by the state subsequent to the enactment of the Federal Assimilative Statute."[2] The United States appealed to this Court under 18 U. S. C. § 3731, and we noted probable jurisdiction. 352 U. S. 962.

The 1948 Assimilative Crimes Act was enacted as part of the Revised Criminal Code of the United States and reads as follows:

"§ 13. Laws of States adopted for areas within Federal jurisdiction.

"Whoever within or upon any of the places now existing or hereafter reserved or acquired as pro-

---

[1] There is no contention that the acts here charged were punishable under any enactment of Congress other than by virtue of the Assimilative Crimes Act, and there is no contention that Randolph Air Force Base is not a federal enclave subject to 18 U. S. C. § 13.

[2] The order also included the following paragraph:

"It is further the opinion of this Court that Section 13, Title 18, United States Code, enacted in 1948, wherein it assimilates and adopts said criminal statutes enacted by the state subsequent to the enactment of said section, to-wit: Articles 535 (b) and 535 (c) of the Texas Penal Statutes, enacted in 1950, upon which all four counts of this indictment are predicated, is a delegation of Congress' legislative authority to the states in violation of the Constitution of the United States."

vided in section 7 [3] of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." 18 U. S. C.

In the absence of restriction in the cessions of the respective enclaves to the United States, the power of Congress to exercise legislative jurisdiction over them is clearly stated in Article I, § 8, cl. 17, and Article IV, § 3, cl. 2, of the Constitution.[4] See *Collins* v. *Yosemite Park Co.,* 304 U. S. 518. The first Federal Crimes Act, enacted in 1790, 1 Stat. 112, defined a number of federal crimes and referred to federal enclaves. The need for dealing

---

[3] Section 7 contains the following provision:

"The term 'special maritime and territorial jurisdiction of the United States,' as used in this title, includes:

. . . . .

"(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U. S. C.

[4]                    "Article. I.

. . . . .

"Section. 8. The Congress shall have Power . . .

. . . . .

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of Particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature

more extensively with criminal offenses in the enclaves was evident, and one natural solution was to adopt for each enclave the offenses made punishable by the State in which it was situated. See *United States* v. *Press Publishing Co.*, 219 U. S. 1, 9–13. Initially there was room for a difference of opinion as to the desirability of doing this by blanket legislation, rather than by a code enumerating and defining specific offenses applicable to the enclaves. Congress made its initial decision on this point in 1825 by adopting for otherwise undefined offenses the policy of general conformity to local law. On repeated occasions thereafter Congress has confirmed that policy by enacting an unbroken series of Assimilative Crimes Acts. During the same period, Congress has recognized a slowly increasing number of federal crimes in the field of major offenses by enacting for the enclaves specific criminal statutes which have defined those crimes and, to that extent, have excluded the state laws from that field.[5]

---

of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . .

"Article. IV.

"Section. 3. . . .

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State." U. S. Const.

[5] For example, the following offenses committed within federal enclaves are now made criminal by such enactments of Congress: arson, 18 U. S. C. § 81; assault, 18 U. S. C. § 113; maiming, 18 U. S. C. § 114; larceny, 18 U. S. C. § 661; receiving stolen property, 18 U. S. C. § 662; false pretenses "upon any waters or vessel within the special maritime and territorial jurisdiction of the United States," 18 U. S. C. § 1025; murder, 18 U. S. C. § 1111; manslaughter, 18

In the Act of 1825, sponsored by Daniel Webster in the House of Representatives, Congress expressly adopted the fundamental policy of conformity to local law.[6] That Act provided the basis from which has grown the Assimilative Crimes Act now before us. Congress thereby made it clear that, with the exception of the enlarged list of offenses specifically proscribed by it, the federal offenses in each enclave were to be identical with those proscribed by the State in which the enclave was situated. That Act made no specific reference to subsequent repeals or amendments by the State of any assimilated laws. It also made no specific reference to new offenses that might be added by the State after the enactment of the Assimilative Crimes Act.

In 1831, there was certified by a Circuit Court to this Court in *United States* v. *Paul,* 6 Pet. 141, the concrete question whether, under the Assimilative Crimes Act of 1825, a statute enacted in 1829 by the State of New York, defining a new offense to be known as burglary in the third degree, was applicable to the federal enclave at West Point. The question was submitted without argument and this Court's answer is reported in full as follows:

"Mr. Chief Justice MARSHALL stated it to be the opinion of the Court, that the third section of the

U. S. C. § 1112; attempted murder or manslaughter, 18 U. S. C. § 1113; malicious mischief, 18 U. S. C. § 1363; rape, 18 U. S. C. § 2031; carnal knowledge, 18 U. S. C. § 2032; and robbery, 18 U. S. C. § 2111.

[6] "SEC. 3. . . . if any offence shall be committed in any of the places aforesaid, the punishment of which offence is not specially provided for by any law of the United States, such offence shall, upon a conviction in any court of the United States having cognisance thereof, be liable to, and receive the same punishment as the laws of the state in which such fort, dock-yard, navy-yard, arsenal, armory, or magazine, or other place, ceded as aforesaid, is situated, provide for the like offence when committed within the body of any county of such state." 4 Stat. 115.

act of Congress, entitled 'an act more effectually to provide for the punishment of certain crimes against the United States, and for other purposes,' passed March 3, 1825, is to be limited to the laws of the several states in force at the time of its enactment. This was ordered to be certified to the Circuit Court for the southern district of New York." *Id.*, at 142.

There is nothing in that answer or in the report of the case to show that the issue was decided as anything more than one of statutory construction falling within the doctrine calling for the narrow construction of a penal statute. So interpreted, the decision did not reach the issue that is before us. It did, however, carry a fair implication that the Act of 1825 was constitutional insofar as it made applicable to enclaves the criminal laws in force in the respective States at the time of the enactment of the Assimilative Crimes Act. This Court later so held in *Franklin* v. *United States*, 216 U. S. 559.

Due to the limitation of the Assimilative Crimes Act of 1825 to state laws in force at the time of its own enactment, the Act gradually lost much of its effectiveness in maintaining current conformity with state criminal laws. This result has been well called one of static conformity. To renew such conformity, Congress has enacted comparable Assimilative Crimes Acts in 1866, 14 Stat. 13; in 1874 as R. S. § 5391; in 1898, 30 Stat. 717; in 1909 as § 289 of the Criminal Code, 35 Stat. 1145; in 1933, 48 Stat. 152; in 1935, 49 Stat. 394; in 1940, 54 Stat. 234; and finally in 1948 in the Revised Criminal Code as 18 U. S. C. § 13.

The above series of substantial re-enactments demonstrates a consistent congressional purpose to apply the principle of conformity to state criminal laws in punishing most minor offenses committed within federal enclaves. In the re-enactments of 1866, 1874, 1898 and 1909, the interpretation given the Act of 1825 by the *Paul*

case was made explicit by expressly limiting the assimilation to the state laws "now in force," or as the "laws of the State . . . now provide . . . ." In the Acts of 1933, 1935 and 1940, Congress continued to prescribe assimilation to the state laws "in force" on specified recent dates, and these three re-enactments also made the assimilation conditional upon the state laws "remaining in force at the time of the doing or omitting the doing of such act or thing . . . ." [7] This helped to keep the federal law current with the state law by reflecting future deletions from the state laws as soon as made.

In 1948, coincidentally with its revision of the Criminal Code of the United States, Congress finally adopted the present language. This expressly limits the assimilation to acts or omissions committed within a federal enclave and "not made punishable by any enactment of Congress . . . ." It further specifies that "Whoever . . . is guilty of any act or omission which . . . would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, *by the laws thereof in force at the time of such act or omission,* shall be guilty of a like [federal] offense and subject to a like punishment." (Emphasis supplied.) This assimilation applies whether the state laws are enacted before or after the Federal Assimilative Crimes Act and at once reflects every addition, repeal or amendment of a state law.[8] Recognizing its underlying policy of 123 years'

[7] See H. R. Rep. No. 263, 73d Cong., 1st Sess.; 77 Cong. Rec. 5530–5532, 5920; and H. R. Rep. No. 1022, 74th Cong., 1st Sess.

[8] The Reviser's Note to § 13 states the situation simply:

"The revised section omits the specification of any date as unnecessary in a revision, which speaks from the date of its enactment. Such omission will not only make effective within Federal reservations, the local State laws in force on the date of the enactment of the revision, but will authorize the Federal courts to apply the same measuring stick to such offenses as is applied in the adjoining State

standing, Congress has thus at last provided that within each federal enclave, to the extent that offenses are not pre-empted by congressional enactments, there shall be complete current conformity with the criminal laws of the respective States in which the enclaves are situated.

There is no doubt that Congress may validly adopt a criminal code for each federal enclave. It certainly may do so by drafting new laws or by copying laws defining the criminal offenses in force throughout the State in which the enclave is situated. As a practical matter, it has to proceed largely on a wholesale basis. Its reason for adopting local laws is not so much because Congress has examined them individually as it is because the laws are already in force throughout the State in which the enclave is situated.[9] The basic legislative decision made by Congress is its decision to conform the laws in the enclaves to the local laws as to all offenses not punishable by any enactment of Congress. Whether Congress sets forth the assimilated laws in full or assimilates them by reference, the result is as definite and as ascertainable as are the state laws themselves.

Having the power to assimilate the state laws, Congress obviously has like power to renew such assimilation annually or daily in order to keep the laws in the enclaves

under future changes of the State law and will make unnecessary periodic pro forma amendments of this section to keep abreast of changes of local laws. In other words, the revised section makes applicable to offenses committed on such reservations, the law of the place that would govern if the reservation had not been ceded to the United States." 18 U. S. C.

[9] We do not now pass upon the effect of the Assimilative Crimes Act where an assimilated state law conflicts with a specific federal criminal statute, cf. *Williams* v. *United States*, 327 U. S. 711, or with a federal policy. Cf. *Johnson* v. *Yellow Cab Co.*, 321 U. S. 383; *Stewart & Co.* v. *Sadrakula*, 309 U. S. 94; *Hunt* v. *United States*, 278 U. S. 96; *Air Terminal Services, Inc.* v. *Rentzel*, 81 F. Supp. 611; *Oklahoma City* v. *Sanders*, 94 F. 2d 323.

current with those in the States. That being so, we conclude that Congress is within its constitutional powers and legislative discretion when, after 123 years of experience with the policy of conformity, it enacts that policy in its most complete and accurate form. Rather than being a delegation by Congress of its legislative authority to the States, it is a deliberate continuing adoption by Congress for federal enclaves of such unpre-empted offenses and punishments as shall have been already put in effect by the respective States for their own government. Congress retains power to exclude a particular state law from the assimilative effect of the Act. This procedure is a practical accommodation of the mechanics of the legislative functions of State and Nation in the field of police power where it is especially appropriate to make the federal regulation of local conduct conform to that already established by the State. Cf. *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94, 100–101.

Examples of uses made by Congress of future state legislative action in connection with the exercise of federal legislative power are numerous. The Webb-Kenyon Act of March 1, 1913, 37 Stat. 699, 700, 27 U. S. C. § 122, prohibited the shipment of intoxicating liquors into a State to be used "in violation of any law of such State . . . ." West Virginia subsequently enacted a prohibition law. This Court nevertheless upheld the applicability of the Federal Act as it assimilated that subsequent state statute. *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311, 326. See also, *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149,[10] 169

---

[10] In *Knickerbocker Ice Co.* v. *Stewart, supra,* this Court voided a statute which attempted to make state workmen's compensation laws applicable to injuries within the federal admiralty and maritime jurisdiction. The basis of that holding, which we do not now re-examine, was that "the Constitution not only contemplated but actually established" a "harmony and uniformity" of law throughout the

(Justice Holmes' dissent), and *United States* v. *Hill*, 248 U. S. 420.

The Federal Black Bass Act, as amended, 61 Stat. 517, 66 Stat. 736, 16 U. S. C. § 852, prohibited the transportation of fish in interstate commerce contrary to the law of the State from which it is transported. And see 18 U. S. C. § 43.

The Johnson Act, 64 Stat. 1134, 15 U. S. C. § 1172, prohibiting the transportation of gambling devices in interstate commerce, provides that a State may exempt itself from the Act. See *Nilva* v. *United States*, 212 F. 2d 115.[11]

In the less closely related field of civil law, the Federal Tort Claims Act, 28 U. S. C. § 1346 (b), bases the liability of the United States on "the law of the place where the act or omission occurred."

The Social Security Act, as amended, 71 Stat. 519, 42 U. S. C. A. (1957, Cum. Ann. Pocket Pt.) § 416 (h)(1), provides that an applicant shall be considered a husband or wife of an insured individual "if the courts of the State in which such insured individual is domiciled at the time such applicant files an application . . . would find that such applicant and such insured individual were validly

admiralty jurisdiction. *Id.*, at 164. That statute was voided because it was designed to "destroy" what was considered to be a constitutionally required uniformity. *Ibid.* In contrast, the statute now before us is designed to effectuate a long-standing congressional policy of conformity with local law.

[11] The applicability of criminal provisions under the Connally Hot Oil Act, 49 Stat. 30, 15 U. S. C. § 715, depends upon the adoption of state conservation laws. See *Humble Oil & Refining Co.* v. *United States*, 198 F. 2d 753.

Under the Fugitive from Justice Act, 18 U. S. C. § 1073, it is criminal for a person to travel in interstate commerce to avoid prosecution for specified crimes as defined "under the laws of the place from which he flees . . . ." Cf. *Hemans* v. *United States*, 163 F. 2d 228.

married *at the time such applicant files such application . . . ."* (Emphasis supplied.)

The Bankruptcy Act, 52 Stat. 847, 11 U. S. C. § 24, provides that it shall not affect the allowance of exemptions prescribed "by the State laws in force at the time of the filing of the petition . . . ." See *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 189–190.

Under 63 Stat. 25, 50 U. S. C. App. § 1894 (i) (1) and (2), States were authorized to free certain local areas from federal rent control either by passing local rent control legislation of their own, or by determining that federal rent control was no longer necessary. See *United States* v. *Shoreline Cooperative Apartments, Inc.,* 338 U. S. 897, reversing, *per curiam,* 84 F. Supp. 660.

This Court also has held that Congress may delegate to local legislative bodies broad jurisdiction over Territories and ceded areas provided Congress retains, as it does here, ample power to revise, alter and revoke the local legislation. *District of Columbia* v. *Thompson Co.,* 346 U. S. 100, 106, 109–110; *Christianson* v. *King County,* 239 U. S. 356; *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655.[12]

---

[12] *Wayman* v. *Southard,* 10 Wheat. 1, 47–50, is not controlling. In that case, Chief Justice Marshall stated that Congress could not constitutionally delegate to state legislatures the power to adopt future "rules of practice" and "modes of proceeding" which would bind federal courts. In 1872, that decision was met by Congress in the adoption of the Conformity Act, 17 Stat. 197, which prescribed:

"Sec. 5. That the practice, pleadings, and forms and modes of proceeding in other than equity and admiralty causes in the circuit and district courts of the United States *shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes* in the courts of record of the State within which such circuit or district courts are held, any rule of court to the contrary notwithstanding . . . ." (Emphasis supplied.) While this Act was later restricted by interpretation, the validity of its application to future state practice was generally accepted by the courts. See Hart and Wechsler, The Federal Courts and the Federal

The application of the Assimilative Crimes Act to subsequently adopted state legislation, under the limitations here prescribed, is a reasonable exercise of congressional legislative power and discretion.[13]  Accordingly, the judgment of the District Court is reversed and the case is remanded to it for further action consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

There are two provisions of the Constitution involved in the present controversy.  Article I, § 1 provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  A supplementary provision is that contained in Art. IV, § 3, cl. 2: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."

It is, therefore, the Congress, and the Congress alone, that has the power to make rules governing federal enclaves.  I suppose there would be no doubt, at least after *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, that this rule-making power could not be exercised by the President, let alone some federal agency such as the Department of the Interior.  The power to make laws under which men are punished for crimes calls for as serious a deliberation as the fashioning of rules for the seizure of the industrial plants involved in the *Youngstown* case.  Both call for the exercise of legislative judg-

System (1953), 581–586; Warren, Federal Process and State Legislation, 16 Va. L. Rev. 421, 557–570 (1930); Clark and Moore, A New Federal Civil Procedure, 44 Yale L. J. 387, 401–411 (1935).

[13] See generally, Note, The Federal Assimilative Crimes Act, 70 Harv. L. Rev. 685 (1957).

ment; and I do not see how that requirement can be satisfied by delegating the authority to the President, the Department of the Interior, or, as in this case, to the States. The Court held in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, that the determination of what constitutes "fair competition" may not be left with the industry affected, subject to approval by the President. For the codes promulgated would have the standing of federal statutes. "But Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." *Id.,* at 537–538. The code-making authority was held to be an unconstitutional delegation of legislative power. *Id.,* at 542. "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is . . . vested." *Id.,* at 529.

The vice in the *Schechter* case was not that the President was the one who received the delegated authority, but that the Congress had abdicated the lawmaking function. The result should be the same whether the lawmaking authority, constituted by Congress, is the President or a State.

Of course Congress can adopt as federal laws the laws of a State; and it has often done so. Even when it does so without any enumeration of the laws, it "has acted as definitely as if it had repeated the words" used by the State, as Mr. Justice Holmes said in *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149, 167. Also Congress could, I think, adopt as federal law, governing an enclave, the state law governing speeding as it may from time to time be enacted. The Congress there determines what the basic policy is. Leaving the details to be filled in by a State is analogous to the scheme of delegated implementa-

tion of congressionally adopted policies with which we are familiar in the field of administrative law. But it is Congress that must determine the policy, for that is the essence of lawmaking. Under the scheme now approved a State makes such federal law, applicable to the enclave, as it likes, and that law becomes federal law, for the violation of which the citizen is sent to prison.

Here it is a sex crime on which Congress has never legislated. Tomorrow it may be a blue law, a law governing usury, or even a law requiring segregation of the races on buses and in restaurants. It may be a law that could never command a majority in the Congress or that in no sense reflected its will. It is no answer to say that the citizen would have a defense under the Fifth and Sixth Amendments to unconstitutional applications of these federal laws or the procedures under them. He is entitled to the considered judgment of Congress whether the law applied to him fits the federal policy. That is what federal lawmaking is. It is that policy which has led the Court heretofore to limit these Assimilative Crimes Acts to those state laws in force at the time of enactment of the Federal Act. *United States* v. *Paul,* 6 Pet. 141. And see *Franklin* v. *United States,* 216 U. S. 559, 568–569.

There is some convenience in doing what the Court allows today. Congress is saved the bother of enacting new Assimilative Crimes Acts from time to time. Federal laws grow like mushrooms without Congress passing a bill. But convenience is not material to the constitutional problem. With all due deference to those who are convinced the other way, I am forced to conclude that under this Assimilative Crimes Act it is a State, not the Congress, that is exercising the legislative power under Art. I, § 1 of the Constitution and that is making the "needful Rules and Regulations" envisioned by Art. IV, § 3, cl. 2. That may not constitutionally be done.