UNITED STATES of America

v.

Henry A. MOLT and Robert A. Udell
et al.

Crim. No. 77–336.

United States District Court,
E. D. Pennsylvania.

June 1, 1978.

---

tions arising from an alleged conspiracy to smuggle snakes and sundry other reptiles into this country.[1] Defendants pleaded not guilty to all counts and have moved to dismiss the indictment on the ground that the Lacey Act, 18 U.S.C. § 43, is unconstitutional.[2]

Although we do not find it necessary to rule on the constitutionality of the Lacey Act, defendants' motion will be granted in part for the reasons set forth fully below.

## I. THE INDICTMENT:

The charges in the indictment which are relevant to the present issue may be summarized as follows:

1. From 1973, to 1974, defendant Molt owned and operated the Philadelphia Reptile Exchange of Willow Grove, Pennsylvania, which engaged in the business of buying and selling reptiles and animals.

2. Defendant Christensen, an amateur herpetologist, accepted Molt's invitation to accompany him during the summer of 1973, on a world-wide trip for the purpose of collecting reptiles for personal gain and profit.

3. Defendant Udell, also an amateur herpetologist, managed the Philadelphia Reptile Exchange during Molt's absence from about June 23, 1973, until early August of 1973.

Thomas E. Mellon, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward F. Kane, Norristown, Pa., for defendant Molt.

Malvin L. Skaroff, Philadelphia, Pa., for defendant Udell.

### OPINION AND ORDER

FOGEL, District Judge.

On August 4, 1977, the Grand Jury returned a thirty count indictment charging defendants with numerous statutory viola-

4. During June, 1973, Molt and Christensen made numerous shipments from Fiji to the Sacramento City Zoo, California, of reptiles collected in Fiji. Upon arrival, the reptiles were forwarded to Udell at the Philadelphia Reptile Exchange.

5. During July, 1973, Molt and Christensen purchased reptiles in Papua New Guinea. Some of the reptiles were sent to the Philadelphia Zoo; some were sent to Willow Grove, Pennsylvania. The others were

---

1. Defendants were also charged in five other indictments (criminal numbers 77–337, 77–338, 77–339, 77–340 and 77–341) involving similar charges arising from the same conspiracy. In the interests of judicial economy, the parties have stipulated that our decision in this case shall apply to the other cases as well.

2. Although Christensen pleaded not guilty at his arraignment, he subsequently changed his plea to guilty and was sentenced by this Court on October 21, 1977.

smuggled to Hong Kong, where defendant Wee[3] assisted Molt and Christensen in falsely labeling them and sending them to Philadelphia where they were received by Udell.

6. During the fall of 1973, Molt and Christensen transported some of the reptiles they had sent to the Philadelphia Reptile Exchange from Fiji, Hong Kong and New Guinea, to zoos in Washington, D. C., New York, Texas, and Pennsylvania.

7. Defendants never obtained any permit or authorization from the Fiji Custom Service, Exchange Control Ordinance, Suva, Fiji, or the Conservatory of Fauna, Department of Agriculture, Stock and Fisheries, Port Moresby, Papua New Guinea, which would have permitted their acquisition and exportation of reptiles in Fiji and Papua New Guinea respectively.

## II. THE ACT:

The Lacey Act provides in pertinent part as follows:

*Transportation of wildlife taken in violation of State, National, or foreign laws; receipt; making false records*

(a) Any person who—

(1) delivers, carries, transports, or ships, by any means whatever, or causes to be delivered, carried, transported, or shipped for commercial or noncommercial purposes or sells or causes to be sold any wildlife taken, transported, or sold in any manner in *violation of any Act of Congress or regulation issued thereunder*, or,

(2) delivers, carries, transports, or ships, by any means whatever, or causes to be delivered, carried, transported, or shipped for commercial or noncommercial purposes or sells or causes to be sold in interstate or foreign commerce any wildlife taken, transported, or sold in any manner *in violation of any law*

*or regulation of any State or foreign country* ; or

(b) Any person who—

(1) sells or causes to be sold any products manufactured, made, or processed from any wildlife taken, transported, or sold in any manner *in violation of any Act of Congress or regulation issued thereunder*, or

(2) sells or causes to be sold in interstate or foreign commerce any products manufactured, made, or processed from any wildlife taken, transported, or sold in any manner *in violation of any law or regulation of a State or a foreign country*, or

(3) having purchased or received wildlife imported from any foreign country or shipped, transported, or carried in interstate commerce, makes or causes to be made any false record, account, label, or identification thereof, or

(4) receives, acquires, or purchases for commercial or noncommercial purposes any wildlife—

(A) taken, transported, or sold *in violation of any law or regulation of any State or foreign country* and delivered, carried, transported, or shipped by any means or method in interstate or foreign commerce, or

(B) taken, transported, or sold *in violation of any Act of Congress or regulation issued thereunder*, or

(5) *imports from Mexico to any State, or exports from any State to Mexico*, any game mammal, dead or alive, or part or product thereof, except under permit or other authorization of the Secretary or, in accordance with any regulations prescribed by him, having due regard to the requirements of the Migratory Birds and Game Mammals Treaty with Mexico and the laws of the United States forbidding importation of certain live mammals injurious to agriculture and horticulture;

---

**3.** Defendant Wee, a/k/a Wee Boon Keng, who apparently is a citizen of Singapore, failed to appear for his arraignment on August 12, 1977, and was placed in untriable status by the Court's Order of September 29, 1977.

shall be subject to the penalties prescribed in subsections (c) and (d) of this section. (emphasis added)[4]

## III. ASSIMILATION OF FOREIGN LAW:

Defendants contend that because the Act assimilates foreign laws without limitations similar to those imposed on Congress by our Constitution, the statute must be held to be unconstitutional. Although we do not accept this conclusion, we do find that the instant case does not fall within the ambit of the Act.

In reaching our decision we are mindful of the possibility that the foreign laws assimilated by the Lacey Act could conflict with constitutional guarantees. However, it is well settled that courts are bound to uphold the validity of a statute when a reasonable construction of the statute removes constitutional impediments. *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 803, 98 L.Ed. 989 (1954). *Hence, the mere fact that a foreign law could prove unconstitutional does not in and of itself provide a sufficient basis for invalidating the statute.* The Supreme Court, in *United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), stated the following with respect to such an approach:

> We do not now pass upon the effect of the Assimilative Crimes Act where an assimilated state law conflicts with a specific federal criminal statute . . . .[5]

We do not believe that Congress intended to attach substantial criminal sanctions[6] to any violation of foreign law irrespective of its character and content. Such an interpretation of the Act would produce bizarre results. For example, a literal interpretation of subsection (b)(4)(A) of the Act would result in the criminal culpability of one who received wildlife from a third party knowing that they had transported the wildlife in a foreign country by driving a car without a driver's license. Surely Congress never intended such a result; accordingly, we turn to the legislative history of the Act for guidance.

A Senate Report was issued in connection with the 1969 Amendments to the Lacey Act which described the underlying purpose of the Act as follows:

> The provisions of this bill reflect the urgency of increasing protection for those species of fish and wildlife whose continued existence is presently threatened. It will prohibit the importation into the United States of endangered species, and it directs the Secretary of State to seek similar action by foreign countries. Thus, by gradually drying up the international market for endangered species, it should help tremendously in reducing the poaching of any such species in the country where it is found.[7]

\* \* \* \* \* \*

On the international level, the purpose is similar. By prohibiting the sale in the United States of wildlife protected by a foreign government, the demand for poached wildlife from that country will be sharply reduced. In addition, however, such a law is also designed to promote reciprocity. If we assist a foreign country in enforcing its conservation laws by closing our market to wildlife taken illegally in that country, they may in turn help to enforce conservation laws of the United States by prohibiting the sale

---

4. 18 U.S.C. § 43(a), (b).

5. 355 U.S. at 293 n. 9, 78 S.Ct. at 296 n. 9.

6. 18 U.S.C. § 43(d) and (e) provide:
   (d) Any person who knowingly and willfully violates any provision of subsection (a) or (b) of this section shall, upon conviction, be fined not more than $10,000 or imposed for not more than one year, or both.
   (e) Any wildlife or products thereof seized in connection with any knowing and willful viola-

tion of this section with respect to which a penalty may be imposed pursuant to subsection (d) shall, upon conviction of such violation, be forfeited to the Secretary to be disposed of by him in such manner as he deems appropriate. . . .

7. S.Rep.No.91–526, 91st Cong., 1st Sess. 3 (1969), U.S.Code Cong. & Admin.News 1969, pp. 1413, 1415.

within their borders of wildlife taken illegally within the United States.[8]

■ Thus, the underlying purpose of the Act is to protect and preserve the endangered wildlife species of the United States and foreign countries. In view of this specific expression of legislative intent, and the requirement that criminal statutes be strictly construed,[9] we hold that insofar as violations of foreign law are concerned, the scope of the Lacey Act is limited to foreign laws which involve, or the purpose of which is, the protection of wildlife.

### A. FIJIAN LAW:

A hearing was held in the present case to ascertain the precise character and substance of the foreign laws which were allegedly violated.[10] Robin Nair, a Fijian attorney with five years working experience in the Attorney General's Office in Fiji, testified as to one law which the defendants allegedly violated, Section 197, Chapter 170, Customs Ordinance of Customs Ordinance of Fiji.[11] His testimony regarding this Ordinance may be summarized as follows:

1. It prohibits the exportation of any goods, other than passenger's baggage, unless an export entry is made for such goods —(N.T. p. 13);

2. It requires the payment of duties in connection with the exportation of goods— (N.T. p. 13);

3. Its purpose is to facilitate the collection of duties on exportation of goods— (N.T. p. 20); and

4. It had not been amended as of January, 1978—(N.T. p. 22); Robin Nair also testified that in June, July, and August of 1973, (the time period during which the defendants allegedly illegally exported wildlife from Fiji), Fiji did not have any laws prohibiting the exportation of wildlife —(N.T. p. 20).

■ In view of this unrebutted testimony, we find that the Fijian law which the defendants allegedly violated was a revenue law, and not a law designed for the protection of wildlife. Accordingly, we hold that

8. *Id*, at 12, U.S.Code Cong. & Admin.News 1969, p. 1425.

9. In *United States v. Boston & Maine R. R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965) the Supreme Court stated:

> A criminal statute is to be construed strictly, not loosely. Such are the teachings of our cases from *United States v. Wiltberger*, 5 Wheat 76, 5 L.Ed. 37, down to this day. Chief Justice Marshall said in that case: 'The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.'
> *Id.*, p. 95, 5 L.Ed. 42.

See also, *Mourning v. Family Publications Service*, 411 U.S. 356, 375, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–222, 73 S.Ct. 227, 97 L.Ed. 260 (1952); *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); *United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917).

10. Rule 26.1 of the Federal Rules of Criminal Procedure provides:

> . . . The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not

submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

11. This ordinance provides in pertinent part as follows:

> *       *       *       *       *       *
>
> *Conditions of Export:*
>
> No goods, other than passenger's baggage, shall be taken on board any aircraft or ship for export unless the exporter or his agent shall have previously delivered to the Comptroller an entry outwards in the prescribed form and shall at the same time have paid all duties and charges upon the goods:
> Provided that—
> (a) with the authorization of the Comptroller, goods produced in Fiji and liable to a duty or tax on exportation, may be shipped previous to the delivery by the exporter or his agent of a perfect entry for such goods, subject to the delivery of a perfect entry within six days after the loading is complete and to such other conditions as the Comptroller may impose;
> (b) the Comptroller may, subject to such conditions as he may see fit to impose, relax the requirements of this section in relation to any goods.

it is beyond the purview of the Lacey Act's assimilative provisions.

## B. PAPUA NEW GUINEA LAW:

At the same hearing, Judge James Staples, an Australian Federal Judge, and a member of the Bar of the High Court of Australia testified as to the alleged violations of the law of Papua New Guinea, Customs Prohibited Regulation, 1973, Regulation 2, Item 5,[12] as follows:

1. This law, as well as all other laws of Papua New Guinea, derived from legislation created by the Parliament of Australia —(N.T. p. 34);

2. The Papua New Guinea Act of 1949 to 1973, enacted by the Parliament of Australia, created a House of Assembly in Papua New Guinea—(N.T. p. 34);

3. As of 1963, the House of Assembly of Papua New Guinea possessed the power to make ordinances for the peace, order and government of New Guinea with the exceptions of the areas of national defense and foreign affairs—(N.T. p. 35);

4. The House of Assembly of Papua New Guinea enacted legislation granting legislative authority to an Administrator to promulgate regulations for the peace, order and government of New Guinea—(N.T. p. 35);

5. To the best of his knowledge there is no legal decision or doctrine delimiting the scope of the grant of legislative power "for the peace, order and government" of New Guinea—(N.T. p. 43);

6. Papua New Guinea Customs Prohibited Regulation 2, Item 5 was promulgated by the Administrator pursuant to his power to promulgate rules for the peace, order and government of Papua New Guinea—(N.T. p. 41);

7. In Judge Staples' opinion, Customs Prohibited Regulation 2, Item 5 was de-

---

**12.** This Regulation provides in relevant part as follows:

STATUTORY INSTRUMENT.
No. 14 of 1973.

REGULATIONS MADE UNDER THE "CUSTOMS ORDINANCE 1951–1971".
\* \* \*
CUSTOMS (PROHIBITED EXPORTS) REGULATIONS 1973.
1. CITATION.
These Regulations may be cited as the Customs (Prohibited Exports) Regulations 1973.
2. EXPORTATION OF CERTAIN GOODS.
The exportation of the goods specified in the second column of the Schedule to these Regulations—
    (a) where the words "Permission of" followed by the name or description of one or more persons or a body appear in the third column of that Schedule opposite to those goods—is prohibited unless the prior written permission of that person or of one of those persons or that body (as the case may be) is obtained for exportation; or
    (b) where conditions or requirements are set out in the third column of that Schedule opposite to the description of those goods—is prohibited unless those conditions or requirements are complied with; or
\* \* \*

Reg. 2                SCHEDULE.

| Item No. | Description of Goods | Nature of Conditions (etc.) or Name of Person to Give Permission. |
|---|---|---|
| | \* \* \* | |
| 5. | Fauna (other than animal products of the pastoral or fishing industries) | Permission of the Administrator |

signed for the protection of the Papua New Guinea fauna—(N.T. pp. 40, 41).

■ Despite Judge Staples' *opinion* regarding the underlying purpose of this Regulation, we find that the Government has failed to prove beyond a reasonable doubt that it was designed for the protection of wildlife.[13] The record reveals that the Regulation was promulgated under an extremely broad legislative delegation "for the peace, order and government of New Guinea"—(N.T. p. 35). Furthermore, Judge Staples testified that to the best of his knowledge, there were no legal decisions or doctrines defining the limits of this legislative grant—(N.T. p. 43). In view of this state of the record, we are not convinced beyond a reasonable doubt that this Regulation—which on its face appears to be nothing more than a revenue schedule—was designed for the protection of Papua New Guinea wildlife. Therefore, since " . . . ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity, . . ." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), *citing Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955), we hold that this Regulation is not within the scope of the Lacey Act. Accordingly, we need not address the constitutional issues underlying the defendants' other contentions.

An order will be issued dismissing those counts of the indictment based solely upon defendants' alleged violations of the laws of Fiji and Papua New Guinea.

---

**13.** Few points of law are as well settled as the rule that the burden is on the government to establish beyond a reasonable doubt every element necessary to constitute the crime. *Davis v. United States*, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); *See, Mullaney v. Wilbur*, 421 U.S. 696, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).