July 24, 1979

## 79-55  MEMORANDUM OPINION FOR THE ASSISTANT TO THE PRESIDENT FOR DOMESTIC AFFAIRS & POLICY

### Constitutional Law—Commerce Clause (Article I, Section 8, Clause 3)—Constitutional Aspects of the Proposed Energy Mobilization Board Legislation

The purpose of this memorandum is to expand on and to memorialize this Office's legal advice to your staff regarding the Administration's proposal to create an Energy Mobilization Board (Board).

The Board, to be established in the Executive Office of the President, would have three members appointed by the President with the advice and consent of the Senate. The Board's central purpose would be to expedite the completion of designated "critical energy facilities"—projects intended to reduce the Nation's reliance on imported oil.

Expedition would be achieved by the Board's establishment of a Project Decision Schedule (Schedule), setting a timetable for all Federal, State, and local decisionmaking required for the completion and operation of a critical energy facility (CEF). Should any agency fail to render a decision within the set time, the Board itself would then make the decision, applying the Federal, State, or local law that the supplanted agency would have applied. In establishing the Schedule, the Board would be authorized to waive any Federal, State, and local procedural decisionmaking requirements, such as those relating to the methods of decisionmaking and timing. While no substantive environmental and other standards could be changed, the Board would be authorized to either (1) designate a lead agency to prepare a single comprehensive environmental impact statement (EIS) for a CEF, or (2) waive Federal, State, and local EIS requirements and adopt another method of evaluating the environmental impact of a CEF. The Board would also be authorized to waive Federal, State, and local laws and regulations enacted or promulgated after the commencement of construction of a critical energy facility if the new requirement hindered its expeditious completion and if grant of a waiver would not unduly endanger public health or safety.

The Administration's proposal also seeks to expedite the completion of CEFs by limiting and expediting judicial review, because the Board decision designating CEFs and establishing Schedules would not be subject to review. All other actions would be subject to review only in a Federal court of appeals. Parties challenging agency action would have 60 days from the completion of the permit process to bring suit unless the Board determines that earlier review is necessary in order to expedite completion of the process or to ensure fairness. In reviewing Board and agency decisions, the courts of appeal would apply the appropriate Federal, State, and local substantive law.

The proposal raises constitutional questions of first impression, and our memorandum addresses these issues.

## I. The Board's Decisionmaking Authority

The purpose of the legislation is to expedite completion of energy projects designed to reduce national dependence on foreign sources of oil. Effectuation of the important national interests of reducing oil imports and increasing domestic energy production is within Congress' broad power under the Commerce Clause of the Constitution, Article I, Section 8, Clause 3. The Supreme Court has, however, recognized limits on the exercise of congressional power under the Commerce Clause when legislation interferes with traditional state functions. *See, National League of Cities* v. *Usery,* 426 U.S. 833 (1976). The proposal is subject to challenge on this ground because it empowers the Board to: (1) set decision schedules binding on State and local agencies; (2) waive State and local procedural decisionmaking requirements; and (3) supplant State and local decisionmakers. We treat these questions *seriatim.*

### A. Scheduling

Under the proposal, all State and local agencies would be required to forward to the Board a proposed timetable for actions related to approval of a CEF and the Board then sets a deadline for each decision. In cases of "exceptional national need," this deadline could be shorter than the one set by State or local law.

It could be argued that Congress would exceed its power under the Commerce Clause by authorizing a Federal agency to make a decision. This argument takes on force when one considers the possibility that such decisions may be made by local units of government—*e.g.,* town councils.

In *National League of Cities* v. *Usery, supra,* the Court invalidated extension of the Fair Labor Standards Act's (FLSA) minimum and maximum hour standards to State and local governments. The Court's opinion, written by Mr. Justice Rehnquist, held that the Federal requirements had a significant impact upon the functioning of State and local governments, compelling them to forego governmental activities and displacing

local policies regarding the manner in which governmental services would otherwise be supplied. *Id., at* 847–48. Thus, the extension was found to "impermissibly interfere with the integral governmental functions" of States and localities. The Court concluded that "insofar as the challenged amendments operate to displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3." *Id., at* 852.

The reasoning of the Court provides the framework for analysis of the constitutionality of the Administration's proposal. It could be forcefully argued that local decisions on land use, health, and safety are traditional State functions and that Federal imposition of deadlines is an impermissible intrusion in the decisionmaking process that "may substantially restructure traditional ways in which local governments have arranged their affairs." 426 U.S., at 849.

Notwithstanding such contentions, we believe that the scheduling mandate of the Board is not contrary to the holding in *National League of Cities*. First, the Court stressed the financial burden imposed by FLSA on States and localities. Here, Congress would not be imposing a burden, altering fiscal policies, curtailing traditional State and local activities, or regulating the provision of traditional services. The Federal Government would not be directing local governing bodies to decide a matter in a particular way; localities would be free to grant or deny permits and licenses pursuant to State and local standards. Nor would the Board require localities to perform a new function; it would simply set a deadline for a decision that would otherwise be made at some time. Analytically, State and local decisionmakers and procedures would not be displaced because there is no power in the Board to require such agencies to follow the Schedule. The Board could not, for example, seek injunctive relief to require a State agency to meet the Schedule. Rather, the situation here is analogous to several complex Federal regulatory programs, such as the Clean Air Act discussed below, which set specific ground rules for State action and which provide for preemption by Federal agencies of the State role if those rules are not followed. Such programs have been sustained against constitutional challenges similar to those that we may anticipate would be leveled against a statute enacting the Administration's program. We therefore believe that the Board may be empowered to set reasonable deadlines for local decisions.

Moreover, it should be noted that Mr. Justice Blackmun joined the Court's opinion in *National League of Cities* because it "adopts a balancing approach, and does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential." 426 U.S. at 856.

We believe that the balancing approach suggested by Mr. Justice Blackmun would sustain the authority of Congress to empower the Board to determine State and local deadline. The seriousness of the energy crisis

is apparent, and its impact on foreign policy, national security, and international monetary policy will, we assume, be the major focus of congressional deliberation concerning this proposal. A CEF may be designated only if a project has been determined "to be critical in contributing to the reduction of the nation's dependence upon imported oil or petroleum products;" and State and local deadlines may be shortened only "[i]n circumstances of exceptional national need." We are persuaded that these interests will be sufficient to override a local agency's interest in deciding when to decide. The national interest in expedition seems strong enough to overcome State and local decisionmaking processes that, Congress finds, delay decisions necessary to the expeditious completion of CEFs.

## B. Waiver of State Procedures

For the reasons discussed above, we believe that the authority of the Board to waive State and local procedural requirements passes constitutional muster. Since substantive standards such as those regarding the environment, land use, health, and safety are specifically excluded from a waiver, there is no threat to the provision of traditional State and local services. Waivers impose no financial burden on the States or localities; if anything, they are likely to conserve State and local resources. Again, we believe that the critical national interest at stake outweighs State or local interest in any particular decisionmaking procedures. Our conclusion, however, is subject to two qualifications. First, the waiver power of the Board is subject to due process limitations. Since it is likely that private rights will be at stake when property is taken or a particular land use is permitted, wholesale waiver of procedures could deny injured persons due process protection. Second, wholesale waiver may obstruct a local agency's ability to make a rational decision or to carry out a traditional function. For example, total waiver of State and local environmental impact requirements might make it impossible in particular cases for a State to evaluate adequately the environmental impact of a facility and thus could hinder its rational function of protecting the public health and safety.[1] But these are problems of degree, not kind. The possibility that a court might find that a particular instance of waiver denied constitutional rights or unconstitutionally interfered with a State's performance of its sovereign functions would not void the waiver provision as a whole. So long as the Board applied a procedural waiver reasonably and "in circumstances of exceptional national need," we believe such action would be constitutional.

---

[1] This problem is mitigated by the proposal's requirement that "in each case of waiver, the Board shall establish alternative procedures for the assessment of environmental impacts of the facility."

## C. Displacement of State and Local Decisionmaking

The proposal provides that if a State or local agency fails to meet a deadline established by the Schedule, the Board may make the decision in lieu of the agency, thus intruding on authority exercised by State and local officials. It could be argued that supplanting decisionmaking strikes at the heart of State and local sovereignty, an integral governmental function.

However, the constitutional power of Congress to supplant local decisionmakers is already well established. Under the Commerce Clause, Congress may preempt local decisionmaking altogether and it may deprive local government totally from exercising its sovereign powers. Preemption of State and local laws that interfere with Federal energy policy is commonplace. *See, e.g.,* § 6(b) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 755(b).

The critical distinction under the case law is between removing decisionmaking from the State and local authorities on the one hand and forcing State and local authorities to implement Federal programs on the other. This distinction is made clear by the courts of appeal decisions that considered constitutional challenges to the Clean Air Act, 42 U.S.C. § 7401 *et seq.,* and the Environmental Protection Agency's (EPA) implementing regulations. That Act gives States the opportunity to establish plans implementing Federal air pollution standards. If a State fails to develop an adequate plan, the EPA is authorized to promulgate a plan for the State. 42 U.S.C. § 7410(c)(1).[2] The EPA adopted regulations that would have subjected States to an injunction or criminal penalties for failure to implement the EPA-promulgated plan. The States challenged the constitutionality of the regulations, claiming that Congress would not authorize the EPA to compel State enforcement of Federal programs. Three courts of appeal suggested that EPA regulations exceeded Congress' power under the Commerce Clause by invading State sovereignty. *Brown* v. *EPA,* 521 F.(2d) 827, 834–40 (9th Cir. 1975); *District of Columbia* v. *Train,* 521 F.(2d) 971, 992–94 (D.C. Cir. 1975); *Maryland* v. *EPA,* 530 F.(2d) 215, 225–28 (4th Cir. 1975).[3] The courts distinguished a constitutional difference between Federal regulation of commerce and Federal regulation of State action in the commerce field. To the extent that EPA regulations forced State legislatures to enact laws or be subject to penalties, those regulations impermissibly intruded upon State sovereignty. The District of Columbia Court of Appeals held that the EPA was "attempting to commandeer the regulatory powers of the states, along with their personnel and resources, for use in administering and enforcing a federal regulatory

---

[2] The Federal Water Pollution Control Amendments, 33 U.S.C. § 1313(b), contain a similar provision.

[3] The judgments of the three courts of appeal were subsequently vacated and remanded by the Supreme Court based on an EPA concession that its regulations went beyond the power granted to it by the Clean Air Act. *See, EPA* v. *Brown,* 431 U.S. 99 (1977).

program * * * " 521 F.(2d), at 992. The court stated that EPA could seek State cooperation. Absent cooperation, the "recourse contemplated by the Commerce Clause is direct federal regulation of the offending activity and not coerced state policing of the details of an intricate federal plan under threat of federal enforcement proceedings." *Id.,* at 993. Similarly, the Fourth Circuit noted the difference between inviting a State to administer regulations and compelling administration under threat of injunction and criminal sanctions. While questioning the constitutionality of EPA regulations, the court had no problem with the "time honored and constitutionally approved device of threat and promise * * * . The threat is a federally imposed regulation with federal administration; the promise is the invitation for Maryland to enact a suitable implementation plan and administer it with state employees, thus avoiding federal interference." 530 F.(2d) at 228. None of the courts of appeal suggested that the authority of EPA to promulgate compliance plans for States that failed to comply was unconstitutional.

The distinction drawn by these cases strongly supports the constitutionality of the proposed Board procedures. We believe that Congress on an adequate record can preempt all State and local law that interfered with the construction of a critical energy facility. The Administration's EMB proposal, however, does not go so far; it seeks to achieve State and local cooperation without altering State and local law. The proposal sets a deadline for State action, inviting the States to act; if that deadline passes, the Board is empowered to make the decision. There is no conscription of State or local personnel or services; there is no compulsion of State or local action. States and localities are given the opportunity to act within a certain time before they lose their ability to act. Such a scheme clearly seems to fit within the "time honored and constitutionally approved device of threat and promise." *Maryland* v. *EPA, supra,* 530 F.(2d), at 228. In fact, this proposal is less intrusive than a scheme of total preemption because the Board will apply the substantive law of the States and localities[4] and its decisions will be subject to judicial review under the relevant State and local standards.

## II. Judicial Review of State and Local Decisions

As outlined above, review of Board actions and decisions by Federal, State, and local agencies under the Schedule would be lodged exclusively in the Federal courts of appeal. The reviewing court would apply the Federal, State, or local law governing the challenged decisions. This raises the questions whether Congress may oust State courts of jurisdiction and whether Federal courts are capable of receiving such jurisdiction under Article III of the Constitution.

---

[4]The incorporation of State and local laws as the Federal standards for decisions made by the Board in lieu of State and local decisionmakers is not novel. In the area of Federal taxation, the Internal Revenue Service routinely interprets and applies State laws establishing property rights in determining Federal tax liability. *See, e.g., Morgan* v. *Commissioner,* 309 U.S. 78 (1940).

## A. Divesting State Court Jurisdiction

Congress has clear authority to vest in the Federal courts exclusive jurisdiction of cases within the purview of Article III of the Constitution. *Bowles* v. *Willingham*, 321 U.S. 503, 511–512 (1944); *The Moses Taylor*, 71 U.S. (4 Wall.) 411, 429–30 (1867). And Federal courts may entertain State matters, applying controlling State law, if Congress so provides. *The Mayor* v. *Cooper*, 73 U.S. (6 Wall.) 247 (1867) (civil removal); *Tennessee* v. *Davis*. 100 U.S. 257 (1879) (criminal removal). Nor is it unusual for Federal courts to apply and interpret State law. Since *Erie RR. Co.* v. *Tompkins,* 304 U.S. 64 (1938), Federal courts sitting in diversity have applied substantive State law. Federal courts also apply State criminal law under the Assimilative Crimes Act, 18 U.S.C. § 13, and under removal statutes. *See, Tennessee* v. *Davis,* 100 U.S. at 271–72; *Miller* v. *Kentucky,* 40 F.(2d) 820 (6th Cir. 1930). And cases brought under the Federal Torts Claim Act are governed by State tort liability standards. 28 U.S.C § 1346(b).

Thus, we see no constitutional impediment to vesting exclusive jurisdiction in Federal courts or in having those courts apply the appropriate State or local law. The question that remains, however, is whether the courts of appeal are constitutionally empowered to decide such cases—that is, whether challenges to State and local permit decisions come within Article III.

## B. Jurisdiction in the Courts of Appeal

Under the Administration's proposal, decisions made by the Board in lieu of State and local decisions may be subject to review in the courts of appeal. A suit challenging a Board decision falls within Federal jurisdiction, because the United States is a party to the suit.

If, however, a State or local agency renders a decision within the time limit prescribed by the Schedule, the basis for jurisdiction of a Federal court of appeals is less certain.[5] In such a situation, the question is whether these cases would "arise under" Federal law, and thus whether they may be made subject to Federal jurisdiction under Article III.

In order to examine the proposed basis on Federal court jurisdiction to review State actions, we believe it would be useful to define the context in which such litigation may arise.

---

[5] We note that parties to the State or local agency proceeding may raise before an agency or before a Federal court certain Federal constitutional issues related to the agency's action, adequate to vest jurisdiction in the court over those issues. State claims would then be cognizable in the Federal courts under the doctrine of "pendent" jurisdiction. *See generally, United Mine Workers* v. *Gibbs,* 383 U.S. 715 (1966).

First, State court jurisdiction is being preempted because of the critical need for expeditious judicial review of State and local decisions affecting the planning, construction, and operation of CEFs. This judgment, necessarily reflects a belief that State courts cannot be relied on to reach decisions as promptly as required in order to meet the national objectives established for CEFs.

Second, the Energy Security Corporation would be a governmentally sponsored enterprise with a broad range of powers to shape the overall development of CEFs involved in the sponsorship of CEFs through direct grants or loans, or through construction of a limited number of CEFs. More importantly, the decision to bring a specific energy project under the Federal umbrella by designating it as a CEF triggers a range of actions open to the Board, which further illustrates the Federal interest present in any approval decision by a State or local agency.

Third, judicial review of most decisions made by State and local agencies may present at least some substantial Federal questions. Where, for example, the Board has granted a waiver of State procedural requirements to a State agency in order to enable it to meet its deadline for decisions prescribed by the Schedule, the Federal question whether the waiver power was exercised arbitrarily by the Board and whether the State agency's procedure comported with Federal constitutional requirements might well be part of the litigation.

The Administration's proposal, as presently drafted, provides neither for any overriding principle of Federal law to control the interpretation of State substantive law nor specifically for incorporation of State law as a Federal standard to be administered by State or local decisionmakers as Federal law. Thus, when either the Board or State and local agencies make approval decisions pursuant to State substantive law, they are applying that law *qua* State law. If Congress expressly incorporated State law as the Federal rule of decision, suits challenging those decisions would "arise under" the laws of the United States. *See, Macomber* v. *Bose,* 401 F.(2d) 545 (9th Cir. 1968); *Stokes* v. *Adair,* 265 F.(2d) 662 (4th Cir. 1959), cert. denied, 361 U.S. 816 (1959); *Quadrini* v. *Sikorsky Aircraft Division, United Aircraft Corp.,* 425 F. Supp. 81, 87 (D. Conn. 1977); *Textile Workers Union* v. *American Thread Co.,* 113 F. Supp. 137, 140 (D. Mass. 1953). The decisions establish that Congress may incorporate State law as the Federal standard and also that it may leave to the States the authority to amend the substance of the State laws on the books when the Federal statute effecting such incorporation is enacted. *See, e.g., United States* v. *Sharpnack,* 355 U.S. 286 (1958).[6]

---

[6]Incorporation would permit Congress to freeze State law standards as presently in force. The Administration's proposal, however, does not seek to freeze standards as they may evolve, which suggests that there are no significant policy reasons to have State law directly incorporated, except to the extent that incorporation brings actions relating to a CEF within the purview of Article III.

(Continued)

Assuming, however, that there is at least some symbolic reason to allow State decisionmakers to continue to apply State law *qua* State law, we believe that Federal court jurisdiction under the so-called "protective jurisdiction" theory would be available.

In *International Brotherhood of Teamsters* v. *W.L. Mead, Inc.,* 230 F.(2d) 576 (1st Cir. 1956), the court of appeals upheld the constitutionality of § 301 of the Taft-Hartley Act on the theory of "protective jurisdiction." Under that theory, Congress is not required to displace totally (or presumably to incorporate) all otherwise applicable State law in its comprehensive regulation of a specific area of activity. Rather, Congress may leave issues to be decided by reference to State law but place litigation over those issues and others in Article III courts. 230 F.(2d), at 580–81.

In reaching its conclusion, the court relied on *Williams* v. *Austrian,* 331 U.S. 642 (1947), a case in which Federal jurisdiction was found in a bankruptcy suit in which only State law would be applied by a Federal court.[7] The decision appears to suggest that some limits on "protective jurisdiction" might be derived from Article III, one such being the requirement of a high degree of overall Federal regulation of an area before Federal "protective" jurisdiction could be established. We think that the Administration's overall CEF proposal would clearly meet that threshold test. We would add that the court's analysis received the explicit approval of Justices Burton and Harlan in *Textile Workers Union* v. *Lincoln Mills,* 353 U.S. 448 (1957), where the Court upheld the constitutionality of § 301 of the Taft-Hartley Act on other grounds.

Although we conclude that Federal jurisdiction consistent with Article III's "arising under" requirement may be conferred under either an "incorporation" or "protective jurisdiction" rationale, we would note that such jurisdiction could also be established by empowering the Board to intervene as a party in any case brought in a court of appeals challenging an approval decision made by a State or local agency. In these circumstances, jurisdiction would be established as an Article III matter by virtue of the United States or one of its instrumentalities being a "party" to the suit, *see, United States* v. *San Jacinto Tin Co.,,* 125 U.S. 273 (1888), having a judicially cognizable interest in its subject matter.

---

(Continued)

At least in theory, there might be a Tenth Amendment objection to federalizing the State law to be applied by State agencies, even though Federal law is substantively identical to the displaced State law. The objection would be that the State or local agency has, in effect, been instructed with regard to the law to be applied by it and is therefore required to administer a Federal program without having any freedom to decline to do so. *See, Maryland* v. *EPA, supra.*

[7]*See Also, Schumacher* v. *Beeler,* 293 U.S. 367 (1934). *See generally* Mishkin, "The Federal 'Question' in the District Courts," 53 Columbia L. Rev. 157, 195 (1953).

### III. Conclusion

We conclude that constitutionally the Board may be granted authority to subject State and local agency decisonmaking to the Schedule; to waive nonconstitutional procedural requirements imposed on those agencies by State law; and to act in the place of such agencies when they fail to meet the Schedule. If the Schedule is met, then State sovereignty is respected; if the Schedule is not met, then decisionmaking power passes to the Board. We reach these conclusions acknowledging that these are constitutional law questions with no direct precedent either in judicial decision or historical experience.

We also believe that jurisdiction may be vested in the Federal courts to hear all challenges to approval decisions made by State and local agencies even in cases involving questions of substantive State law, that the Board may be made a party to any such action in order to ensure that the interests of the United States are adequately represented, and that the requirements of Article III are met.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*