783 F.2d 900
 CABAZON BAND OF MISSION INDIANS, Plaintiff-Appellee,
v.
COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, and Ben Clark,
Defendants-Appellants.
MORONGO BAND OF MISSION INDIANS, Plaintiff-Appellee,
v.
COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, and Ben Clark,
Defendants-Appellants.
 No. 84-6635.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1985.
Decided Feb. 25, 1986.
As Amended April 8, 1986.
 
 Glenn M. Feldman, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Washington, D.C., Barbara E. Karshmer, Fresno, Cal., for plaintiffs-appellees.
 Roderick W. Walston, Deputy Atty. Gen., San Francisco, Cal., Glenn R. Salter, Riverside, Cal., Timothy R. Malone, Washington, D.C., for defendants-appellants.
 Appeal from the United States District Court for the Central District of California.
 Before J. BLAINE ANDERSON, FARRIS, and NELSON, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 I. OVERVIEW
 
 1
 The State of California (State) and County of Riverside (County) appeal the district court's granting of the Cabazon and Morongo Indians' (Tribes) motion for summary judgment and its issuance of a permanent injunction restraining the State and County from applying their gambling laws on the reservation. The only issue on appeal is whether state and local gambling laws apply on Indian reservations. We affirm.
 
 II. FACTS
 
 2
 The facts, as stipulated by the parties, are as follows:
 
 
 3
 The Tribes occupy separate reservations situated in Riverside County, California. The Tribes conduct bingo games for profit on their reservations. The profits are the sole source of income for the Tribes and the games provide the main source of employment. The Tribes have their own ordinances regulating the bingo games. The games are operated by non-Indian professional operators, who receive a percentage of the profits. The games are played predominantly by non-Indian participants. The jackpots exceed $250. Under California law, bingo games may be played only for bona fide charitable purposes; the games must be operated by members of the charitable organization; and the jackpots cannot exceed $250. The Tribes' bingo games violate these provisions.
 
 
 4
 The Cabazon Band also conducts three card parlor games on its reservation: draw poker, lowball draw poker, and panguingue. A Riverside County ordinance prohibits the playing of these games.[1]
 
 
 5
 The Tribes filed an action for declaratory and injunctive relief and for damages against Riverside County, alleging that the County could not lawfully prohibit the bingo and card games on the reservation. The State of California intervened. The parties filed cross motions for summary judgment on the jurisdictional question whether State and County gambling laws apply on reservations. The district court granted the Tribes' motion for summary judgment and denied the County and State's motion. The district court issued final judgment on the jurisdictional issues under Rule 54(b) of the Federal Rules of Civil Procedure; issued a permanent injunction restraining the County and State from applying their gambling laws on the reservation; and retained jurisdiction to consider the damages issue. The County and State appealed.
 
 III. DISCUSSION
 
 6
 The State contends that state and local laws pertaining to gambling should apply on Indian reservations under (1) Public Law 280, (2) The Organized Crime Control Act, or (3) federal common law.
 
 A. Public Law 280
 
 7
 The Act of August 15, 1953, Pub.L. No. 83-280, 67 Stat. 588 (Public Law 280) provides some applicability of state law over on-reservation activities. Section 4, codified at 28 U.S.C. Sec. 1360, grants states civil jurisdiction over Indian reservations in words that on the surface seem to make all state laws of general application effective.[2] Barona Group of Capitan Grande Band, etc. v. Duffy, 694 F.2d 1185, 1187 (9th Cir.1982). The Supreme Court, however, has limited the section to give states jurisdiction only over private civil litigation involving reservation Indians in state court. Bryan v. Itasca County, 426 U.S. 373, 385, 96 S.Ct. 2102, 2109, 48 L.Ed.2d 710 (1976); Barona, 694 F.2d at 1187-88. Section 2 of Public Law 280, codified at 18 U.S.C. Sec. 1162, confers on certain states, including California, full criminal jurisdiction over offenses committed by Indians on the reservation.[3] Barona, 694 F.2d at 1188. Thus, Public Law 280 authorizes the application of state "criminal/prohibitory" laws on Indian reservations, but not "civil/regulatory" laws. Id. This court has held that a state law is criminal/prohibitory if the activity the statute addresses violates "public policy," and civil/regulatory if the activity does not. Barona, 694 F.2d at 1188-90. Therefore, the issue that must be resolved in this case is whether the gambling activities conducted by the Tribes on their reservations violate the public policy of the State of California.
 
 
 8
 This court specifically held in Barona that the same California gambling law in question in this case does not, for a variety of reasons, violate California public policy. Id. Hence, said the court in Barona, the California law is civil/regulatory and does not apply to the Indian reservations. Id.
 
 
 9
 The district court judge ruled that Barona is dispositive in the present case. However, he also felt, and the State argues, that the Supreme Court's recent decision in Rice v. Rehner, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), supports a reexamination of Barona and the civil/regulatory-criminal/prohibitory distinction. In Rice, the Supreme Court rejected what it terms the "substantive-regulatory" distinction because neither the text of 18 U.S.C. Sec. 1161 (a federal Indian statute which incorporates state law) nor its legislative history reveal any such distinction. Rice, 463 U.S. at 734 n. 18, 103 S.Ct. at 3303 n. 18. The Court went on to say that "[i]n the absence of a context that might possibly require it, we are reluctant to make such a distinction." Id. It can be said with equal force that neither the text nor the legislative history of Public Law 280 reveal any civil/regulatory-criminal/prohibitory distinction. However, the Supreme Court, in interpreting Public Law 280, has stated that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Bryan, 426 U.S. at 392, 96 S.Ct. at 2112. Although the regulatory bingo statute may arguably be interpreted as prohibitory, the resolution must be in favor of the Indian tribe. Seminole Tribe of Florida v. Butterworth, 658 F.2d 310, 316 (5th Cir.1981). Furthermore, we are bound by the precedent established by this circuit in Barona[4] which is factually and legally indistinguishable from the case at bar. Therefore, we hold that the gambling activities of the Tribes on the Indian reservation do not violate California public policy. For that reason, we find that California's bingo statute is civil/regulatory in nature and does not apply, under Public Law 280, on the Indian reservations.
 
 B. The Federal Organized Crime Control Act
 
 10
 The Organized Crime Control Act of 1970, 18 U.S.C. Sec. 1955 (1976) (OCCA) incorporates by reference certain state gambling laws and makes the violation of the state provisions a federal offense.[5]
 
 
 11
 In United States v. Farris, 624 F.2d 890 (9th Cir.1980), cert. denied, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 (1981), this court held that whether a tribal activity is "a violation of the law of a state" within the meaning of the OCCA depends on whether it is contrary to the "public policy" of the state. Id. at 895-96; Barona, 694 F.2d at 1190. "Thus, Farris makes co-extensive the tests for application of state law to Indian reservations under [the OCCA] and for direct application of state law under Public Law 280." Barona, 694 F.2d at 1190. Because we have concluded that bingo games are not contrary to the public policy of California, the activity is not violative of the OCCA.
 
 C. Federal Common Law
 
 12
 We turn now to the State's argument that the Supreme Court has adopted a federal common law in determining the applicability of state laws on Indian reservations.[6] This requires a "particularized inquiry" into "the nature of state, federal, and tribal interests at stake." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). See also Queets Band of Indians v. State of Washington, 765 F.2d 1399, 1406 (9th Cir.1985), vacated upon settlement of the parties, 783 F.2d 154 (9th Cir. 1986). Under this particularized inquiry test, state laws may be applied to Indian reservations unless such application would (1) interfere with reservation self-government, or (2) impair a right granted or reserved by federal law. Rice, 463 U.S. at 718, 103 S.Ct. at 3294; Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973).
 
 
 13
 The Supreme Court's decision in Rice states that "our recent cases have established a 'trend ... away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption.' " Rice, 463 U.S. at 718, 103 S.Ct. at 3294 (quoting McClanahan v. Arizona State Tax Comm., 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973)). However, aside from a strong federal policy to encourage and foster tribal self-government and to promote reservation economic development, New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), there is apparently no federal law preempting the determination of the applicability of state and local gambling laws on Indian reservations. Therefore, federal law does not create a barrier to the application of state and local gambling laws on Indian reservations.[7] However, our analysis does not end here.
 
 
 14
 Federal preemption is only one of two barriers to state jurisdiction; such jurisdiction is also barred if it would impermissibly infringe upon the right of the reservation Indians to make their own laws and to be governed by them. Williams v. Lee, 358 U.S. 217, 221, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959). As has been pointed out by the Supreme Court, theconcept of tribal sovereignty and independence still plays a role in the preemption analysis to the extent that it provides a "backdrop" against which federal policy and interests must be measured. White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583; McClanahan, 411 U.S. at 172, 93 S.Ct. at 1262. The role of inherent tribal sovereignty in preemption analysis is defined by "notions of sovereignty that have developed from historical traditions of tribal independence." Rice 463 U.S. at 719, 103 S.Ct. at 3295 (quoting White Mountain, 448 U.S. at 145, 100 S.Ct. at 2584). "When we determine that tradition has recognized a sovereign immunity in favor of the Indians ..., then we usually are reluctant to infer that Congress has authorized the assertion of state authority...." Rice, 463 U.S. at 719, 103 S.Ct. at 3295.
 
 
 15
 Accordingly, we turn to the state, federal and tribal interests at stake in order to determine whether application of the state and local gambling laws will interfere with reservation self-government. If so, then these laws may not be applied on the reservation under the federal common law's particularized inquiry test.
 
 1. State Interest
 
 16
 The State contends that it has a significant state interest in prohibiting tribal bingo games in order to prevent the intrusion of organized crime in California. Although this is a legitimate concern, there is no evidence whatsoever that organized crime exists on these Indian reservations. Furthermore, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." White Mountain, 448 U.S. at 144, 100 S.Ct. at 2584. The California bingo laws regulate only the operation of certain types of gambling. These laws do not make it a crime to participate in the gambling activities. Therefore, the state gambling laws are directed at the on-reservation conduct of the Tribes and not the conduct of non-Indians on the reservations. As a consequence, we find that the State's interest, although commendable, is weak.
 
 2. Federal Interest
 
 17
 Current federal policy is to encourage and foster tribal self-government and to promote reservation economic development. See Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378 (citing to and quoting from numerous federal statutes that support these goals). This federal policy was further evidenced by President Reagan's statement that: "It is important to the concept of self government that tribes reduce their dependence on federal funds by providing a greater percentage of the cost of their self government." Statement by the President: Indian Policy, The White House, January 24, 1983. Furthermore, tribal bingo games have been recognized as one way to support this policy. A policy directive issued by the Assistant Secretary of the Interior on March 2, 1983 stated that the Department of the Interior would "strongly oppose" any proposed legislation that
 
 
 18
 would subject Indian individuals, Indian organizations, and tribal governments to state laws with regard to licensing, regulation or prohibition of gambling on Indian reservations.... Such a proposal is inconsistent with the President's Indian Policy Statement of January 24, 1983.... A number of tribes have begun to engage in bingo and similar gambling operations on their reservations for the very purpose enunciated in the President's Message. Given the often limited resources which tribes have for revenue-producing activities, it is believed that this kind of revenue-producing possibility should be protected and enhanced.
 
 
 19
 Finally, an affidavit submitted on behalf of the Tribes by the Director of Indian Services, Bureau of Indian Affairs, stated that:
 
 
 20
 It is the department's position that tribal bingo enterprises are an appropriate means by which tribes can further their economic self-sufficiency, the economic development of reservations and tribal self-determination. All of these are federal goals for the tribes. Furthermore, it is the Department's position that the development of tribal bingo enterprises is consistent with and in furtherance of President Reagan's Indian Policy Statement of January 24, 1983.
 
 
 21
 Based on the foregoing, we find the federal interest to be strong.
 
 3. Tribal Interests
 
 22
 The Tribes offer a number of compelling interests in favor of their position. The bingo games operated on the reservations are the Tribes' only source of income. The games are the major source of employment for the reservation Indians and the sole source of revenue for operating their tribal governments and for providing services to their members.
 
 
 23
 The State argues that the tribal interest is weak for two reasons: (1) they are "marketing an exemption" from state laws to non-Indians who go on the reservation; and (2) the tribal tradition does not encompass commercial gambling, particularly where predominantly non-Indian participants are involved.
 
 
 24
 a. Marketing an Exemption
 
 
 25
 In support of their contention that the Tribes are "marketing an exemption" from California law, the State cites Washington v. Confederated Tribes of the Colville Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).
 
 
 26
 In Colville, the Indian tribes sought to bar the State of Washington from enforcing a cigarette excise tax and a general sales tax on cigarette sales by on-reservation tobacco outlets to non-Indian purchasers. The Supreme Court held that the imposition of these taxes on on-reservation purchases of cigarettes by non-Indians was valid. For the following reasons, we find that Colville does not support the State's contention.
 
 
 27
 First, the Supreme Court in Colville did not rule that a Tribe's "marketing of a [tax] exemption" enabled the state to prohibit the Tribe from engaging in the underlying activity, which is what the State is trying to accomplish in this case. Rather, the Court ruled that if all the Tribe is marketing to non-Indians is an exemption from state taxes which the state would otherwise use to provide off-reservation services to off-reservation residents, then the Tribe's legitimate interest in making those sales would not outweigh the state's legitimate interest in taxing those same transactions. In the current case, the tribal interest in providing revenue and jobs for its members outweighs the State's interest in protecting against the potential for intrusion of organized crime.
 
 
 28
 Second, in Colville, the Court recognized that the Tribe's interest in generating revenues for essential governmental programs "is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes...." Colville, 447 U.S. at 156-57, 100 S.Ct. at 2082-83. See Mescalero Apache Tribe, 462 U.S. at 337, 103 S.Ct. at 2387-88. Even the State concedes that "the revenues here are derived from value generated by on-reservation activities...." Appellant's Brief at 28, n. 11. Instead of merely importing products to resell in a manner which deprives the State of revenues which would be used to provide state services off-reservation, the Tribes in this case built and help operate gambling facilities, employ tribal members, regulate and conduct these activities wholly within their reservation, and utilize the funds to provide necessary governmental services for their members. We agree with both parties that the revenues here are derived from value generated on the reservation by activities involving the Tribes. We therefore find the Tribes' interest to be strong.
 
 
 29
 b. Tribal Tradition
 
 
 30
 As we pointed out earlier, tribal tradition remains highly relevant in determining whether state laws apply on Indian reservations. The State contends that the Tribes involved in this case did not traditionally engage in tribally sponsored, high stakes commercial gambling operations catering primarily to non-Indian participants. Therefore, since no such tradition exists, we "may accord less weight to the 'backdrop' of tribal sovereignty." Rice, 463 U.S. at 720, 103 S.Ct. at 3295.
 
 
 31
 We find it unnecessary to decide this issue because we believe that the State's focus is too narrow. The focus in determining whether a tribal tradition exists should instead be on whether the tribe is engaged in a traditional governmental function, not whether it historically engaged in a particular activity. The Tribes in this case are engaged in the traditional governmental function of raising revenue. They are thereby exercising their inherent sovereign governmental authority. One of our recent decisions supports this analysis. In Crow Tribe of Indians v. State of Montana, 650 F.2d 1104 (9th Cir.1981), modified at 665 F.2d 1390 (1982), we cited zoning and automobile registration as examples of activities which, though obviously not "traditional" tribal activities, were nonetheless among the "traditional governmental functions" currently exercised by Indian tribes. Id. at 1110.
 
 
 32
 Having determined that a tradition exists which recognizes a sovereign immunity in favor of the Indians, we are reluctant to infer that the State should exercise authority in this case. See Rice, 463 U.S. at 719, 103 S.Ct. at 3295.
 
 
 33
 In light of the foregoing discussion, we find that the federal and tribal interests at stake here outweigh the State's interest. Therefore, under the federal common law's particularized inquiry test, the State and County may not apply their gambling laws on the Indian reservations because application of these laws would interfere with reservation self-government.
 
 
 34
 We affirm the summary judgment and the permanent injunction restraining the County and the State from applying their gambling laws on the reservations.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 We find no basis upon which to distinguish the Tribe's bingo activities from the Tribes' card parlor games. Therefore, our discussion in this case, although specifically addressing the bingo games, applies with equal force to the card games
 
 
 [2]
 Section 4(a), as codified at 28 U.S.C. Sec. 1360(a) (1976), provides:
 (a) Each of the States ... listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed ... to the same extent that such State ... has jurisdiction over other civil causes of action, and those civil laws of such State ... that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State ...:
 ....
 California..... All Indian country within the State.
 
 
 [3]
 Section 2(a), as codified at 18 U.S.C. Sec. 1162(a) (1976), provides:
 (a) Each of the States ... listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed ... to the same extent that such State ... has jurisdiction over offenses committed elsewhere within the State ... and the criminal laws of such State ... shall have the same force and effect within such Indian country as they have elsewhere within the State ...:
 ....
 California..... All Indian country within the State.
 
 
 [4]
 Rice may be indicative of a trend away from the civil/regulatory-criminal/prohibitory distinction in determining the application of federal and, by incorporation, state statutes on Indian reservations. However, Rice does not overrule Barona nor does it alter its precedential weight. Rice involved the interpretation of 18 U.S.C. Sec. 1161, a statute not involved here. Furthermore, one of the principal underpinnings of the Rice decision was the fact that in the particular context of liquor licensing, the Court found no "firm federal policy of promoting tribal self-sufficiency and economic development." Rice, 463 U.S. at 724, 103 S.Ct. at 3298 (quoting White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583). As we discuss below, the same is not true with respect to tribal bingo activities
 
 
 [5]
 The Organized Crime Control Act, 18 U.S.C. Sec. 1955 provides:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section--
 (1) 'illegal gambling business' means a gambling business which--
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 [6]
 We examine this argument only after having decided that there is no federal law preempting the determination of the applicability of state and local gambling laws on Indian reservations. Although resort to federal common law occurs only as a "necessary expedient" in a "few and restricted instances," resort may be had to federal common law in the absence of an applicable Act of Congress. See Milwaukee v. Illinois, 451 U.S. 304, 313-14, 101 S.Ct. 1784, 1790-91, 68 L.Ed.2d 114 (1981)
 
 
 [7]
 At the same time, federal law does not promote nor allow for the application of these laws on the reservations