**UNITED STATES of America, Plaintiff,**

v.

**Eric J. CARLSON, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Randall L. JANSEN, Defendant.**

**Crim. Nos. 86–01253, 87–01469.**

United States District Court,
D. Hawaii.

April 25, 1989.

Daniel Bent, U.S. Atty., and Janet Fenton, Sp. Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff.

Hayden Aluli, Asst. Federal Public Defender, and Jack Schweigert, Honolulu, Hawaii, for defendants.

## ORDER AFFIRMING JUDGMENTS OF CONVICTION

FONG, Chief Judge.

### INTRODUCTION

At individual bench trials held before Magistrate Bert S. Tokairin, defendants Eric J. Carlson ("Carlson") and Randall L. Jansen ("Jansen") were convicted of motor vehicular offenses arising out of separate incidents that occurred upon federal military installations. Magistrate Tokairin found each defendant guilty of speeding on a military base in violation of *Haw.Rev. Stat.* § 291C–102, a state crime purportedly made federal under the Assimilative Crimes Act ("ACA"), 18 U.S.C. § 13. Accordingly, the magistrate imposed the relevant fines against each defendant for the speeding offenses; specifically, defendant Carlson was fined $11.00 and defendant Jansen $21.00.

The primary issue on these consolidated appeals from the magistrate's judgments of conviction is whether federal courts have jurisdiction by virtue of the ACA to adjudicate vehicular speeding offenses that occur within federal enclaves in Hawaii. Although apparently trivial at first blush, this novel question raises important concerns both of statutory construction and of federalism. Because the court finds Hawaii's speeding statute to be prohibitory rather than regulatory—that is, more criminal than civil in nature—and because the court dispenses with the remaining issues on appeal, defendants' separate convictions are affirmed.

### BACKGROUND

#### I. DEFENDANT CARLSON

After first being acquitted for driving under the influence of alcohol, defendant Carlson was convicted on September 9, 1986, for speeding on a military base; Carlson was sentenced to pay an $11.00 fine. On May 4, 1986, Carlson had been stopped by a military police officer at Schofield Barracks, a military installation in Hawaii, for driving 36 m.p.h. in a 25 m.p.h. zone. At the close of the government's case, defendant Carlson moved for a judgment of acquittal, arguing that the government had failed to establish that the military base's speed limit signs had been officially authorized. Failing to provide the court with the proper authority to support his position, however, defendant's motion for acquittal was denied. Subsequently on September 11, 1986, Carlson moved for reconsideration of his speeding conviction on the basis of the Hawaii Supreme Court's opinion in *State v. Lane*, 57 Haw. 277, 554 P.2d 767 (1976). Defendant Carlson also appealed the magistrate's conviction to this district court on September 18, 1986.

In response to Carlson's motion for reconsideration, Magistrate Tokairin issued an order dated October 23, 1986, which found that he no longer had jurisdiction over the case, due to the notice of appeal already pending before this court. Accordingly, defendant Carlson filed a second notice of appeal with this court on October 24, 1986. On April 6, 1987, this court vacated Carlson's appeal and remanded the case to the magistrate, finding that the magistrate, as the trier of fact, was in the best position

to decide whether the speed limit signs at issue had been authorized. Thus, Magistrate Tokairin was to address defendant Carlson's original motion for reconsideration.

On May 1, 1987, the government filed a "Further Opposition to Defendant's Motion for Reconsideration" which raised a significant new issue material to Carlson's motion before the magistrate—whether the Hawaii speeding statute should be assimilated into federal law pursuant to 18 U.S.C. § 13. The government's opposition also reiterated its previous two arguments: 1) the posted speed limit sign at issue had been properly established by law; and 2) the magistrate must take judicial notice of the lawfully established speed limit. Persuaded by the government's arguments, Magistrate Tokairin denied Carlson's motion for reconsideration on January 6, 1988. Specifically, the magistrate found that Hawaii's speeding law was assimilated into federal law pursuant to 18 U.S.C. § 13. Additionally, Magistrate Tokairin took judicial notice as to the military installation commanders' proper authority to post speed limit signs on federal bases in Hawaii. On May 3, 1988, defendant Carlson timely filed this appeal pursuant to Local Rule 404–4.

## II. DEFENDANT JANSEN

At a separate bench trial held on December 9, 1987, defendant Jansen was tried by Magistrate Tokairin for speeding and driving with a suspended license at Fort Shafter in Hawaii. Jansen had been arrested by military police on September 17, 1987, for driving his car 36 m.p.h. in a 15 m.p.h. zone. Upon completion of the parties' closing arguments, the magistrate took judicial notice of the fact that Fort Shafter's base commander had proper authority to set speed limits on the military base. Subsequently, the magistrate found defendant Jansen guilty of speeding and fined him $21.00; the magistrate, however, acquitted Jansen on the driving with a suspended license charge. Jansen then appealed his speeding conviction on May 3, 1988. In his appeal's initial supporting memorandum, defendant Jansen's sole argument was that

Magistrate Tokairin had based his decision on insufficient evidence. Jansen then filed his present amended appeal of conviction on May 31, 1988, asserting for the first time that the magistrate lacked jurisdiction to adjudicate the speeding charge under the ACA, 18 U.S.C. § 13.

## DISCUSSION

## I. STANDARD OF REVIEW ON APPEAL

 Pursuant to Local Rule ("L.R.") 404–4, cited by defendants as controlling their individual cases on appeal, a defendant's scope of appeal from a magistrate's judgment of conviction in a *misdemeanor* case "shall be the same as on an appeal from a judgment of the district court to the court of appeals." Since speeding offenses in Hawaii are "violations" rather than "misdemeanors," however, *see Haw.Rev. Stat.* §§ 291C–102, 291C–161, L.R. 404–4 technically does not apply. For this same reason, L.R. 404–5, which regulates the scope of appeal from judgments in "civil" cases, also is not applicable. Thus, defendants' consolidated appeals must be taken pursuant to L.R. 404–6 which states as follows:

> Appeals from any other decisions and orders of a magistrate not provided for in this rule should be taken as provided by governing statute, rule or decisional law.

Accordingly, since defendants' consolidated appeals concern novel issues of law, this court's standard of review will be *de novo. United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.1984), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). With this in mind, the court first addresses the jurisdictional issue regarding whether federal courts, pursuant to the ACA, may properly adjudicate speeding violations which occur on federal enclaves within the State of Hawaii.

## II. JURISDICTION UNDER THE ACA

Both defendants argue that their speeding convictions must be reversed, because Magistrate Tokairin lacked jurisdiction un-

der the ACA to adjudicate their cases. In essence, defendants contend that their failure to comply with speed limits posted at the military bases in violation of *Haw.Rev. Stat.* § 291C–102 constitutes a "civil" offense that falls outside the aegis of the ACA, 18 U.S.C. § 13. Since Hawaii has failed to expressly define speeding as being "criminal" in nature, but rather has chosen to label such offenses as "violations," the State's speeding statute arguably can have no effect within federal enclaves.

 To address this issue of first impression, the court first looks to the federal ACA statute itself which provides as follows:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13. According to the Ninth Circuit Court of Appeals, the ACA "makes state *criminal* laws applicable in federal courts exercising territorial jurisdiction over U.S. military bases." *United States v. Bosser,* 866 F.2d 315, 316 (9th Cir.1989) (emphasis added). *See also United States v. Snyder,* 852 F.2d 471, 474 (9th Cir.1988) (under the ACA, "persons who commit crimes incorporated into federal law ... are 'subject to a like punishment' to that imposed by the state for the same crime"); *United States v. Kiliz,* 694 F.2d 628, 629 (9th Cir.1982); *United States v. Hollinshead,* 616 F.Supp. 160, 161 (D.Haw.1985). Thus, the ACA transforms state crimes into federal crimes. Although not expressly limited in its terms to the incorporation of state criminal statutes, the ACA has been so interpreted. *See United States v. Best,* 573 F.2d 1095, 1098 (9th Cir.1978) (the court held that the ACA necessarily incorporates into federal law "only the *criminal*

laws of the jurisdiction within which the enclave exists ...") (emphasis in the original). *See also Hollinshead,* 616 F.Supp. at 161. Accordingly, non-penal civil rules, regulations, and sanctions are excluded from the ACA's reach. *E.g., Snyder,* 852 F.2d at 474; *Hollinshead,* 616 F.Supp. at 161.

 The jurisdictional issue on these consolidated appeals, therefore, turns on the apparently simplistic question of whether Hawaii's speeding statute is defined as being "civil" or "criminal" in nature; if the former, then these speeding convictions must be reversed. In making this semantic distinction, this court is bound by determinations of the State of Hawaii, if any exist, that the speeding statute at issue is "civil" and, thus, outside the ACA's reach; to hold otherwise would be to "encroach on state regulatory systems." *Hollinshead,* 616 F.Supp. at 161, *citing Best,* 573 F.2d at 1102. At the same time, however, this court is not bound by any official determinations by the State that its speeding statute is "criminal." *See Hollinshead,* 616 F.Supp. at 161, *citing United States v. Marcyes,* 557 F.2d 1361, 1364 (9th Cir.1977). Unless this court is allowed to make an independent determination as to the statute's "criminal" character, Hawaii could "enforce its regulatory system on the federal jurisdiction by making criminal any failure to comply with [its] regulations." *Marcyes,* 557 F.2d at 1364. Such deference to Hawaii pronouncements would violate fundamental notions of federal enclave sovereignty.

 The trouble in this case lies in the fact that Hawaii's Penal Code defines speeding convictions to be neither "civil" nor "criminal" in nature, but rather defines such offenses as being "violations." *See Haw.Rev.Stat.* §§ 291C–102, 291C–161. Apparently, "violations" occupy some middle ground between civil and criminal offenses, since they are not expressly "civil" and they certainly are "non-criminal." *See* comment to *Haw.Rev.Stat.* § 701–107. *See also State v. Kailua Auto Wreckers, Inc.,* 62 Haw. 222, 235 n. 13, 615 P.2d 730, 739 n. 13 (1980) (discussing infractions of state

public health regulations, the court noted that such penal code "violations" do not technically constitute crimes; the court, however, did not expressly find such infractions to be "civil" in nature). When states fail to expressly define their offenses as being "civil" in nature, as Hawaii has done here in the speeding context, federal courts need not defer to state courts in the name of federalism. In fact, to do so would jeopardize significant federal interests. Thus, because Hawaii has declined to resolve the ambiguity generated by its speeding statute, it is for this court to clarify whether violations of that statute are more "civil" or "criminal" in nature for purposes of the ACA.

█ In undertaking this semantic analysis, this court must resolve the speeding statute's true nature in keeping with the ACA's underlying policies. As identified by the Court of Appeals for the Ninth Circuit, Congress sought to accomplish the following three goals in enacting the ACA:

1. To establish a gap-filling criminal code for federal enclaves;

2. to provide for conformity in the laws governing a federal enclave and the state in which an enclave is located; and

3. to give the people within the federal enclave as much protection as is afforded to those outside of the enclave.

*Kiliz,* 694 F.2d at 629, *citing United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). *See also United States v. Fulkerson,* 631 F.Supp. 319, 322–324 (D.Haw.1986). Thus, with regard to incidents that occur on military bases such as those involved here, the ACA is to be applied in a manner which upholds the "preference for prosecuting essentially civilian offenses in the district courts ..." *United States v. Debevoise,* 799 F.2d 1401, 1402–1403 (9th Cir.1986), *citing with approval United States v. Mariea,* 795 F.2d 1094 (1st Cir.1986); *United States v. Walker,* 552 F.2d 566, 568 n. 3 (4th Cir.1977), *cert. denied,* 434 U.S. 848, 98 S.Ct. 157, 54 L.Ed.2d 116 (1977). Such generous application of the ACA is necessary to promote the "desire to equalize treatment between military and civilian defendants accused of identical non-service related crimes." *Id. See also Fulkerson,* 631 F.Supp. at 321.

With these fundamental policy considerations in mind, this court also seeks guidance from the Ninth Circuit Court of Appeals' opinion in *United States v. Marcyes,* 557 F.2d 1361 (9th Cir.1977), to resolve its definitional task. In *Marcyes,* the court was faced with a similar problem in the ACA context; specifically, appellants challenged the incorporation of Washington's fireworks laws onto federal Indian reservations within the state. Although violations of the fireworks statute challenged in that case constituted either "misdemeanors" or "gross misdemeanors," *see Wash.Rev.Code* § 70.77.485, thereby seemingly clarifying the "criminal" nature of the offense, appellants argued that the ACA incorporates only "the general criminal code or prohibitory laws of a state." *Marcyes,* 557 F.2d at 1364. Thus, appellants contended that the ACA could not be "utilized to enforce the penal provisions of state regulatory laws such as Washington's fireworks laws," which laws arguably were fundamentally "civil" in nature. *Id.*

Faced with this argument, the Ninth Circuit Court of Appeals chose not to accept Washington's "misdemeanor" and "gross misdemeanor" labels as being dispositive as to the issue of the fireworks statute's true character. Rather, the court followed the "regulatory/prohibitory" distinction first alluded to in the Supreme Court case of *Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 389 n. 8, 64 S.Ct. 622, 625 n. 8, 88 L.Ed. 814 (1944), and concluded that the statute was fundamentally "criminal" in nature. *See Marcyes,* 557 F.2d at 1364. According to the court, the Washington statute's primary intent was to *"prohibit* the general possession and/or sale of dangerous fireworks," rather than to license or regulate such behavior. *Id.* The Court of Appeals made this prohibitory finding, despite the fact that Washington's scheme allowed limited exceptions for public displays and movies. *Id.* As a result of its conclusion that the fireworks statute was essentially "criminal," the court assimilated it into federal enclave law. *Id.*

In an attempt to define the contours of its newly adopted regulatory/prohibitory distinction in the ACA context, the Court of Appeals noted the following:

> The possession of fireworks is not the same situation encountered in other regulatory schemes such as hunting or fishing, where a person who wants to hunt or fish merely has to pay a fee and obtain a license. The purpose of such statutes is to regulate the described conduct and to generate revenues. In contrast, the purpose of the fireworks laws is not to generate income, but rather to prohibit their general use and possession in a legitimate effort to promote the safety and health of all citizens. Moreover, by allowing appellants to operate their [fireworks] stands on the reservation or in any other federal enclave would entirely circumvent Washington's determination that the possession of fireworks is dangerous to the general welfare of its citizens.

*Id.* The court then buttressed its conclusion by reaffirming the ACA's fundamental policy "to fill in the gaps in the criminal law applicable to federal enclaves created by the failure of Congress to pass specific criminal statutes." *Id.* According to the court, assimilation of Washington's fireworks statutes onto Indian lands within the state insured the uniform application of those laws to all citizens, on or off the reservation. *Id.* at 1364–65.

The Ninth Circuit Court of Appeals on numerous occasions has since reaffirmed the continued vitality of this regulatory/prohibitory distinction first recognized in *Marcyes. See, e.g., Cabazon Band of Mission Indians v. County of Riverside,* 783 F.2d 900, 902 (9th Cir.1986), *aff'd and remanded,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Barona Group of Mission Indians v. Duffy,* 694 F.2d 1185, 1188 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *United States v. Farris,* 624 F.2d 890, 897 (9th Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981). In the process, the Court of Appeals has added clarity to that distinction by noting that whether a statute may be classified as regulatory or prohibitory depends on whether the state's legislature has deemed the activity to be against the state's public policy. *See, e.g., Cabazon Band of Mission Indians,* 783 F.2d at 902; *Barona Group of Mission Indians,* 694 F.2d at 1188–89 (the court concluded that an Indian reservation's bingo games are not contrary to the public policy of California). *See also Seminole Tribe of Florida v. Butterworth,* 658 F.2d 310, 316 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

Recognizing the utility of this public policy-based regulatory/prohibitory distinction, the U.S. Supreme Court recently approved of, and thereby added further legitimacy to, its use by courts within the Ninth Circuit. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 210, 107 S.Ct. 1083, 1088–89, 94 L.Ed.2d 244 (1987). Accordingly, this court will look to Hawaii's public policy with regard to speeding, thereby relying on the regulatory/prohibitory distinction to determine whether the State's speeding statute may be assimilated into the federal law pursuant to the ACA. The court does so, however, first by noting that there appears to be no legitimate reason to subject servicemen to different speeding laws and punishments than civilians outside military bases; speeding offenses certainly bear no "special" relation to military duties. *See Fulkerson,* 631 F.Supp. at 321. Thus, the ACA's fundamental policies of "filling in the gaps" of federal law and of "equal treatment" under the law counsel toward assimilating Hawaii's speeding statute into federal enclave law.

When applying the Ninth Circuit Court of Appeals' regulatory/prohibitory distinction to the speeding statute here at issue, the court finds that a public policy test reveals that the statute is primarily prohibitory in intent. Thus, for purposes of the court's ACA analysis, Hawaii's speeding statute is more "criminal" than "civil" in nature and is, therefore, assimilable onto the State's military bases and other federal enclaves. Much like the analogous fireworks situation facing the court in *Mar-*

*cyes*, there is a general prohibition against speeding in the State of Hawaii. Thus, this general prohibition against speeding differentiates the speeding context from the bingo context at issue in *Barona Group of Mission Indians. See id.*, 694 F.2d at 1189 (the court concluded that San Diego County's bingo laws are "regulatory and of a civil nature"). Unlike the situation in *Barona*, the general public never is allowed to behave contrary to this general prohibition —in other words, speeding is never permissible for the general public, while the public "is allowed to play bingo at will in an authorized game." *Id.* Finally, as with the fireworks statute at issue in *Marcyes*, the purpose of Hawaii's speeding statute is not to generate revenues, but rather "to promote the safety and health of all citizens." *Marcyes*, 557 F.2d at 1364. *See also Landry v. Hoepfner*, 840 F.2d 1201, 1213–14 n. 25 (5th Cir.1988) (the court discussed speeding as being "a most grave social problem in the nation"). *Contra Barona Group of Mission Indians*, 694 F.2d at 1190 (the court found that "the stated purpose of the tribal bingo ordinance is to collect money 'for the support of programs to promote the health, education and general welfare' of the Barona Tribe. This intent to better the Indian community is [ ] worthy ..."). All of the above factors lend support to this court's finding of a public policy prohibition within Hawaii with regard to the problem of speeding, which State policy is cemented by federal policies underlying the ACA.

Furthermore, Hawaii itself treats speeding offenses as being more "criminal" than "civil" in nature, since violators are afforded the full gamut of rights associated with any criminal proceeding. Although the State's criminal treatment of such cases is not binding on this court, it is instructive. Accordingly, speeding prosecutions are subject to the state penal code's strict procedural safeguards, including a one-year statute of limitations. *Haw. Rev. Stat.* § 701–108(2)(d). Moreover, violators of Hawaii's speeding statute are given the opportunity at arraignment to plead not guilty and receive a full trial—a penal proceeding governed by Hawaii's Rules of Pe-

nal Procedure. *See* Haw.R.P.P. 1, 54. At such trials, these violators are entitled to have counsel, and the rules of evidence are strictly enforced. Once the trial is completed, violators are found guilty only if proof is "beyond a reasonable doubt," rather than by the more relaxed "preponderance of the evidence" burden of proof used in civil cases. *Haw.Rev.Stat.* § 701–114. Finally, Hawaii's own courts review these speeding violations as being "convictions." *See, e.g., State v. Lane*, 57 Haw. 277, 279, 554 P.2d 767 (1976); *State v. Cieslik*, 1 Haw.App. 403, 404, 619 P.2d 1102 (1980). Such "criminal" treatment of speeding offenses comports with the Hawaii legislature's intent at the time it adopted the State's new Penal Code, which first became effective on January 1, 1973. The legislature's express purpose for revising the State's Penal Code was "to effect a complete reorganization of the criminal law of the State of Hawaii by a redefinition of criminal offenses ..." Stand.Comm.Rep. No. 227, in 1971 House Journal, at 784. As part of this redefinition of *criminal* offenses, the legislature divided those offenses into four grades—felony, misdemeanor, petty misdemeanor, and *violation. Id.* at 785.

That convictions for speeding are punishable by fine, adds further support to the court's conclusion as to their fundamentally criminal nature. Although license revocation or suspension also is possible punishment for speeding violations, *see Haw.Rev. Stat.* § 291C–170, primary emphasis is placed on a system of fines which range up to $500.00. *See Haw.Rev.Stat.* § 291C–161. Hawaii's reliance on fines for such convictions emphasizes that such sentences are imposed primarily for purposes of "punishment" within the meaning of the ACA, thereby making speeding assimilable. *See Bosser*, 866 F.2d at 316–17 (the court assimilated Hawaii's deferred-acceptance rule, finding it to be a form of "punishment" for purposes of the ACA). As the Court of Appeals for the Seventh Circuit has noted:

[A] clear distinction exists between proceedings whose essence is penal, intend-

ed to redress criminal wrongs by imposing sentences of imprisonment, other types of detention or commitment, *or fines,* and proceedings whose purpose is remedial ...

*In re Daley,* 549 F.2d 469, 475 (7th Cir. 1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977) (emphasis added).

The State's reliance on a system of fines also differentiates speeding convictions from violations of Hawaii's implied consent law which is decidedly civil in nature. *See Hollinshead,* 616 F.Supp. at 162. As the court in *Hollinshead* previously emphasized in the implied consent context, that law "provides only for the revocation of a license rather than fines or imprisonment." *Id.* Such "revocation procedures are more consistent with a civil than a criminal statute." *Id. See also Best,* 573 F.2d at 1099–1100 (in *Best,* the appellant did not dispute his sentence of imprisonment or fine for driving under the influence of alcohol, but rather appealed only his license suspension which the court found to be "regulatory and not penal;" thus, the court refused to assimilate only that portion of California's Vehicle Code which provided for the suspension of driver's licenses); *Snyder,* 852 F.2d at 475 (the court here also discussed the unique circumstances surrounding the license suspension context which make such procedures more "civil" than "criminal"); *United States v. Rowe,* 599 F.2d 1319, 1320 (4th Cir.1979) (the court found Virginia's license suspension procedures to be "administrative and civil, not criminal, in nature").

Finally, this court's conclusion, which reaffirms federal court jurisdiction over federal enclave speeding cases based on assimilated Hawaii law, is consistent with decisions reached by other courts faced with the identical question. The Eighth Circuit Court of Appeals, for example, expressly assimilated South Dakota's speeding offenses into federal enclave law, since "there are no enactments of Congress which prohibit ... driving in excess of the speed limit on the Pine Ridge Reservation." *United States v. McMillan,* 820 F.2d 251, 254 (8th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 234, 98 L.Ed.2d 193 (1987).

*See also United States v. James,* 440 F.Supp. 1137, 1138 n. 1 (D.Md.1977) (the court expressly noted that Maryland's speeding violations are assimilated into federal enclave law); *United States v. Block,* 452 F.Supp. 907, 908 (M.D.Fla.1978) (the court implicitly found Florida's speeding statute to be assimilable under the ACA). The Court of Appeals for the Tenth Circuit also "assimilates state traffic laws and others into federal enclave law in order 'to fill in the gaps in the Federal Criminal Code, where no action of Congress has been taken to define the missing offense.' " *United States v. Pino,* 606 F.2d 908, 915 (10th Cir.1979), *quoting United States v. Sosseur,* 181 F.2d 873, 875 (7th Cir.1950). *See also United States v. Chavez,* 6 M.J. 615, 619–20 (A.C.M.R.1978). In fact, Hawaii federal enclave speeding matters long have been referred to the federal courts for resolution under the ACA, due to the absence of controlling federal law in the speeding context. *See Fulkerson,* 631 F.Supp. at 325 (according to Judge King, "[m]ilitary commanders have long recognized the soundness of ... routinely referr[ing] violations of state traffic laws to United States Magistrates for prosecution pursuant to the ACA"). Such assimilation of state speeding laws into federal enclave law was expressly considered and accepted as legitimate even by the dissenters in the U.S. Supreme Court's seminal ACA case, *United States v. Sharpnack. Id.,* 355 U.S. at 298, 78 S.Ct. at 298–99 (Douglas, J., dissenting).

■ For these reasons, Magistrate Tokairin properly asserted jurisdiction pursuant to the ACA over defendants' speeding offenses which occurred upon federal enclaves within the State of Hawaii. As the Ninth Circuit Court of Appeals previously has observed:

> It would render the ACA and its conformity policy meaningless if the defendant could not be prosecuted in federal court for the identical offense on the roads in the federal enclave as he [may have] only moments before perpetrated on the state roads.

*Kiliz,* 694 F.2d at 632. Accordingly, this court now will address the merits of defendants' other contentions.

## III. DEFENDANT CARLSON'S REMAINING ISSUES ON APPEAL

Anticipating this court's rejection of his jurisdictional argument, defendant Carlson next raises the following two issues on appeal: 1) assuming Hawaii's speeding law is assimilated into federal law, whether the federal court should apply *State v. Lane,* 57 Haw. 277, 554 P.2d 767 (1976); and 2) even if this court does not apply the *Lane* standard, whether Magistrate Tokairin abused his discretion in taking judicial notice of an arguably unpublished army regulation. The court will scrutinize each of these additional issues in the order that they were raised.

### A. *Application of State v. Lane*

Since this court has held that the federal courts may assimilate Hawaii's speeding statute into federal enclave law, defendant Carlson argues that the Hawaii Supreme Court's interpretation of that state law in *State v. Lane,* 57 Haw. 277, 554 P.2d 767, is binding on this court. In *State v. Lane,* the Supreme Court of Hawaii held that speeding convictions pursuant to *Haw.Rev. Stat.* § 291C–102 require the prosecution to prove "that a maximum speed limit has been established in one of the two ways specified by the statute." *Id.* at 279, 554 P.2d 767. According to the court, the government bears the burden of showing that the posted speed, which allegedly had been violated, either was established by county ordinance, *Haw.Rev.Stat.* § 291C–102(a), or by the state's director of transportation, *Haw.Rev.Stat.* § 291C–102(b); proof of judicial notice of the applicable ordinance is required to sustain convictions under the former statutory provision, whereas proof that the designated stretch of highway is under the state director of transportation's jurisdiction is required to sustain convictions pursuant to the latter. *Id.* Since the prosecution in this case failed to offer such proof, Carlson argues that his speeding conviction must be reversed. *Id.*

To address this contention, the court first looks to the relevant Hawaii speeding statute, which states as follows under the heading "Noncompliance with speed limit prohibited":

(a) No person shall drive a vehicle at a speed greater than a maximum speed limit and no person shall drive a motor vehicle at a speed less than a minimum speed limit *established by county ordinance.*

(b) *The director of transportation with respect to highways under the director's jurisdiction* may place signs establishing maximum speeds or minimum speed limits. Such signs shall be official signs and no person shall drive a vehicle at a speed greater than a maximum speed limit and no person shall drive a motor vehicle at a speed less than a minimum speed limit stated on such signs. [legislative citations omitted].

*Haw.Rev.Stat.* § 291C–102. (emphasis added). When looking to those portions of the speeding statute emphasized above, which portions were relied upon by the court in *Lane,* this court initially observes that strict adherence to the state court's literal interpretation of that assimilated statute would render it completely unenforceable within federal enclaves. Specifically, the prosecution would never be able to prove that speed limits posted upon federal enclaves had been established in either of the two ways required by *Lane*—county ordinances and state directors of transportation have absolutely no binding authority over federal enclaves.

More importantly, this court is not bound by state court interpretations of state laws that are assimilated into federal law. *See, e.g., Yellow Cab Transit Co.,* 321 U.S. at 391, 64 S.Ct. at 627; *Kiliz,* 694 F.2d at 629. As the Ninth Circuit Court of Appeals has stated:

This Court is free to interpret the extrapolated state criminal statute just as if it were interpreting any federal statute because the assimilated state law, in effect, becomes a federal statute.

*Id.* The Hawaii Supreme Court's interpretation of the state speeding statute, thus, is

"purely advisory" and need not be followed. *Id.* Accordingly, this court cannot accept the Hawaii Supreme Court's *literal* interpretation of that statute, for to do so would be to render the speeding law meaningless in this federal context—*State v. Lane,* in other words, does not establish the essential elements of speeding for the purposes of federal enclave law. Nevertheless, the court will require an analogous finding to be made in federal enclave speeding cases. Specifically, in order to convict persons for speeding in these federal cases, federal magistrates must find some basis in the record to conclude that the disputed speed limit posted upon the federal enclave had been lawfully established. Such lawful establishment of posted limits either may be proven through the introduction of evidence at trial, or by the proper taking of judicial notice. If this authority is judicially noticed, however, such notice must have adequate foundation.

## B. *Propriety of Judicial Notice*

Defendant Carlson's final argument challenges the propriety of this judicial notice taken by Magistrate Tokairin in the instant case, contending that such judicial notice represents an abuse of discretion. In his order denying the defendant's motion for reconsideration, Magistrate Tokairin expressly took judicial notice of the fact that the violated speed limit had been lawfully established. Magistrate Tokairin based his judicial notice on Army Regulation ("A.R.") 190–5, which regulation gives army installation commanders the responsibility to establish motor vehicle traffic policies on their respective military bases. A.R. 190–5, which is appended by Supplement 1 to the United States Army Support Command, Hawaii ("USASCH"), was promulgated by the army in response to 32 C.F.R. §§ 634, *et seq.*—the federal regulations which concern "Motor Vehicle Traffic Supervision" on military installations; all of these regulations were in effect at the time of defendant's speeding violation.

When looking first to the federal regulations judicially noticed by the magistrate, the court notes the broad mantle of authority expressly delegated to military installation commanders in order to regulate motor vehicle traffic on their respective bases. *See* 32 C.F.R. § 634.2. Specifically, the relevant federal regulations state as follows under the label "Driving Privileges":

(a) *Policy.* The operation of a privately owned motor vehicle on a military installation constitutes *a conditional privilege extended by the installation commander.* Individuals desiring the privilege will meet the following sustaining conditions:

(1) *Comply with the laws and regulations governing motor vehicle operation on the installation.*

. . . . .

*Id.* (emphasis added). *Compare* A.R. 190–5 *and* 32 C.F.R. §§ 634 *et seq.* (the former army regulations directly track the policy language of the latter federal regulations). *See also* 15 Air Base Wing Regulation ("A.B.W.R.") 125–14 (this regulation, which follows the same federal mandate, "establishes policies and procedures governing motor vehicle traffic supervision on all 15 ABW installations"—including Hickam Air Force Base); OPNAVINST 5100.-12E (analogous regulation which governs motor vehicle conduct on all naval installations).

These same federal regulations expressly authorize installation commanders to promulgate the specific rules with which to supervise traffic on their military bases. *See* 32 C.F.R. § 634.4(c)(1) ("[i]nstallation or activity commanders will establish a vehicle code applicable to the operation of motor vehicles on the installation. The code will contain a rules of the road section and will, where possible, conform to the code of the state in which the installation is located"). *See also* 32 C.F.R. § 634.1(e)(3)(i). As part of their exercise of authority, installation commanders are to develop traffic circulation plans which incorporate "[j]udicious use of uniform traffic control signs and devices." 32 C.F.R. § 634.4(b)(iv).

In response to this express congressional mandate, army installations in Hawaii have adopted the following motor vehicle rules under the heading "VEHICLE/TRAFFIC REQUIREMENTS":

D–4. SPEED REGULATION. Notwithstanding any speed limit established by this regulation on posted speed limits, no person will operate a vehicle on a military reservation at a speed greater than is reasonable and prudent under the conditions then existing or so as to endanger life or property. When no special hazard exists, the following speed limits are established:

(a) The maximum speed limit within the military installation is 25 m.p.h. on all roads other than those roads in residential areas and service roads unless otherwise posted.

(b) The maximum speed limit on main roads in all residential areas is 20 m.p.h. unless otherwise posted.

(c) The maximum speed limit on service roads, in parking lots, and when passing marching troops is 10 m.p.h.

(d) The maximum speed limit on ranges, in training areas, and on leased lands is 25 m.p.h. unless otherwise posted.

Appendix D, USASCH Supplement 1 (although first effective July 8, 1988, this particular supplement tracks the language of previous supplements to A.R. 190–5 which were in effect at the time of defendant's speeding violation). The above-quoted supplement to A.R. 190–5 also recently responded to the express congressional mandate found in 32 C.F.R. § 634.4(c)(1) by adding the following language: "[t]he traffic laws of the State of Hawaii are applicable on USASCH installations and will be appropriately enforced by law enforcement personnel." USASCH Supplement 1. *See, e.g.,* 15 A.B.W.R. 125–14; OPNAVINST 5100.12E. *See also* 32 C.F.R. § 634.4(c)(4) (according to this federal regulatory provision, even non-assimilated "civil" state traffic laws "are expressly adopted and made applicable to" military installations). Accordingly, the installation commander's authority to establish and post specific speed limits upon these federal military enclaves cannot be questioned. *See, e.g.,* A.R. 190–5

and USASCH Supplement 1 (applicable to army installations); A.R. 190–5 and 15 A.B. W.R. 125–14 (applicable to air force installations); OPNAVINST 5100.12E (applicable to naval installations). The only issue that remains, therefore, is whether the judicial notice taken of this authority was appropriate in this case.

■ Because the magistrate's judicial notice of these federal and army regulations does not pertain to "adjudicative" facts which vary from case to case, the propriety of such notice is governed by the common law; the express contents of these regulations, which contents are standardized from case to case, are more akin to "legislative" facts which fall outside the aegis of Rule 201. *See, e.g.,* Fed.R.Evid. 201(a) (this judicial notice rule "governs only judicial notice of adjudicative facts"); Advisory Committee Notes to Fed.R.Evid. 201(a) ("[n]o rule deals with judicial notice of 'legislative' facts"). *See also Korematsu v. United States,* 584 F.Supp. 1406, 1414 (N.D.Cal.1984), *quoting United States v. Gould,* 536 F.2d 216, 220 (8th Cir.1976) ("[l]egislative facts are 'established truths, facts or pronouncements that do not change from case to case but [are applied] universally, while adjudicative facts are those developed in a particular case ...' "): *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 445 n. 13 (6th Cir.1982) ("[a]djudicative facts are simply the facts of the particular case"). *See also generally,* Keeton, *Legislative Facts and Similar Things: Deciding Disputed Premise Facts,* 73 Minn.L.Rev. 1–72 (1988). Thus, the court here is required to look only to the common law when deciding the propriety of notice taken, giving the magistrate the higher degree of leeway justified in cases where the court has been acting as factfinder. *See Korematsu,* 584 F.Supp. at 1415.

Nevertheless, despite not being required to do so, the court also will seek guidance from the Federal Rules of Evidence in this regard, so that judicial notice in this case certainly is proper in either of the following two situations: 1) if the regulations noticed by the magistrate are "generally known within the territorial jurisdiction of

the trial court," Fed.R.Evid. 201(b)(1); or 2) if the disputed regulations are readily ascertainable by resort "to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). *See also United States v. Decker*, 600 F.2d 733, 738–39 n. 9 (9th Cir.1979), *cert. denied*, 444 U.S. 855, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979). Accordingly, if the judicial notice taken here conforms to the requirements of the more stringent Federal Rules of Evidence as well as to the common law, then Magistrate Tokairin's actions are beyond reproach.

Conducting such a dual analysis which favors the defendant's position on appeal, this court finds that the magistrate's judicial notice of relevant federal and army regulations satisfies both the requirements of the common law and the Federal Rules of Evidence. First, contents of the Code of Federal Regulations, like contents of the Federal Register, *see* 44 U.S.C. § 1507, *"are required to be judicially noticed." Wei v. Robinson*, 246 F.2d 739, 743 (7th Cir.1957), *cert. denied*, 355 U.S. 879, 78 S.Ct. 144, 2 L.Ed.2d 109 (1957) (emphasis added). *See also Crimm v. Missouri Pacific Railroad Co.*, 750 F.2d 703, 710 n. 3 (8th Cir.1984) ("[t]he Code of Federal Regulations is a special or supplemental edition of the Federal Register, 44 U.S.C. § 1510 (1982), and therefore may be judicially noticed under the Federal Register Act. 44 U.S.C. § 1507 (1982)"); *Vallot v. Central Gulf Lines, Inc.*, 641 F.2d 347, 351 (5th Cir.1981). Thus, as the magistrate expressly concluded on reconsideration, the specific army speeding regulations which were lawfully issued pursuant to these federal regulations also are entitled to be judicially noticed, since they are similarly capable of being "accurately determined by resort to sources whose accuracy cannot reasonably be questioned." *United States v. Holmes*, 414 F.Supp. 831, 834 n. 3 (D.Md.1976) (the court took judicial notice of Army Regulation 380–20, although that regulation had not been formally published). *See also United States v. Hangar One, Inc.*, 406 F.Supp. 60, 65 (N.D.Ala. 1975), *rev'd on other grounds*, 563 F.2d 1155 (5th Cir.1977) (the court took judicial

notice of Armed Services Procurement Regulations, concluding that those regulations have the full "force and effect of federal law"). This is not a case in which the government's submission of selective portions of the relevant regulations is misleading on the court; those portions relied upon by the magistrate clearly confirm the installation commander's legal power and authority to post speed limit signs upon his jurisdiction. *Contra United States v. Judge*, 846 F.2d 274, 276 (5th Cir.1988) (the court refused to take judicial notice of certain portions of federal Drug Enforcement Administration regulations, because the government's selective reprinting of them was misleading to the court).

Moreover, since "[f]ederal courts *must* take judicial notice of the statutory and common law of any state of the union without pleading or proof," *Saffold v. McGraw–Edison Company*, 566 F.2d 621, 623 (8th Cir.1977) (emphasis added), it was patently reasonable for the magistrate to have judicially noticed the federal military installation's own speeding regulations. The U.S. Supreme Court already has legitimized the taking of judicial notice of state regulations which are readily ascertainable. *See Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742, n. 4, 96 S.Ct. 2337, 2343 n. 4, 49 L.Ed.2d 179 (1976). Thus, judicial notice of lawfully promulgated regulations cannot be improper merely because a federal enclave, rather than a state, is the court's relevant jurisdiction. *See* Fed.R.Evid. 201(b)(1) (due to the physical nature of the speed limit signs posted at Schofield Barracks, it can be said that these speeding regulations are "generally known within the territorial jurisdiction of the trial court"). This is especially true when, as here, the relevant regulations were issued in direct response to an explicit congressional mandate and an assimilated state law.

Finally, simply because the magistrate first expressly articulated his rationale for taking judicial notice upon reconsideration of his judgment, does nothing to take away from its legitimacy. *See* Fed.R.Evid. 201(f) ("[j]udicial notice may be

taken at any stage of the proceeding"). The court finds that the magistrate properly took judicial notice of these controlling regulations in this case. *See Colonial Leasing v. Logistics Control G.I.*, 762 F.2d 454, 461 (5th Cir.1985) (the court recognized that judicial notice after trial may be proper). This court is persuaded by the record that the magistrate denied defendant's motion for acquittal at trial, at least in part, on the basis of his general knowledge of motor vehicle supervisory procedures adopted upon federal military installations. *See* Fed.R.Evid. 201(b)(1) ("[a] judicially noticed fact must be one not subject to reasonable dispute in that it is ... generally known within the territorial jurisdiction of the trial court ...."). *Cf., e.g., Fulkerson*, 631 F.Supp. at 325 (the court recognized the installation commander's broad discretion to supervise the administration of traffic violations on their military bases); *Chavez*, 6 M.J. at 620 (this court noted the base commander's wide latitude to refer traffic matters to United States magistrates). Furthermore, the evidence adduced at trial reveals that the speed limit sign at issue had been lawfully posted. Trial Transcript, at 6. This court finds, therefore, that Magistrate Tokairin conformed to its requirement that a specific finding must be made regarding the lawful posting of these speed limit signs on federal enclaves. In this way, the court adopts the spirit of *State v. Lane*, if not its literal essence.

Notwithstanding the defendant's assertions to the contrary, therefore, the prosecution in these federal enclave speeding cases need not introduce documentary evidence at trial regarding the installation commander's specific authority to promulgate speed limits on military bases. Rather, the legitimacy of these posted limits, as well as the regulations pursuant to which those limits are promulgated, also may be established by other forms of direct evidence or may be properly noticed by the magistrate. In this case, Magistrate Tokairin utilized both of the latter two methods to support his conviction of defendant Carlson for speeding; therefore, there was no abuse of discretion, and the defendant's conviction must stand.

## IV. DEFENDANT JANSEN'S REMAINING ISSUE ON APPEAL

■ Defendant Jansen's alternative basis for challenging his speeding conviction is on grounds of insufficient evidence. Jansen first argues that the prosecution failed to offer any admissible evidence for purposes of establishing the applicable speed limit for the specific section of roadway at issue. Jansen also contends that no evidence was introduced at trial showing that the observed speed limit sign "was indeed properly correlated with an actual speed limit established by the base commander." Defendant's Amended Appeal From the Decision of Guilty, at 4–5. When reviewing the defendant's challenge to the government's quantum of evidence as to these issues, this court must determine the following:

> [W]hether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the government.

*United States v. Wilmer*, 799 F.2d 495, 502 (9th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir.1986). *See also United States v. Yoshida*, 727 F.2d 822, 823 (9th Cir.1983). If the court finds in the affirmative, then it *must* respect the magistrate's determination of guilt.

When viewed in this light, Jansen's arguments are wholly without merit. As the court already has concluded, to hold the prosecution to the literal *State v. Lane* standard would be to render Hawaii's assimilated speeding statute meaningless on federal enclaves. Thus, the record must reflect only some recognition of the installation commander's authority to promulgate speed limits upon their respective military bases. In this case, Magistrate Tokairin expressly made such a finding by taking judicial notice of such authority at trial.

Tape Recording of Trial, at visual reading 2025–33. Furthermore, at trial the defendant's arresting officer testified that he both visually observed and mechanically confirmed with radar that Jansen was operating his vehicle at a speed of 36 m.p.h. in a 15 m.p.h. zone. *Id.*, at visual reading 1005–85. Defendant's excessive speed was recorded within 500 feet of a clearly posted, officially authorized 15 m.p.h. speed limit sign, and Jansen disputes neither his excessive speed nor the adequacy of the posted sign which gave him proper notice of the speeding regulation then in effect. *Id.*, at visual reading 1150–75. Under these circumstances, the magistrate's conviction on the speeding charge is steeped in evidence more than sufficient to sustain his finding of guilt. Defendant Jansen's speeding conviction, thus, also is upheld.

## CONCLUSION

Accordingly, the convictions of defendant Carlson and defendant Jansen for speeding are AFFIRMED.

IT IS SO ORDERED.